[68 NE3d 683, 45 NYS3d 864]

STONEHILL CAPITAL MANAGEMENT LLC et al., Appellants, v BANK OF THE WEST et al., Respondents.

Argued November 14, 2016; decided December 20, 2016

440

**POINTS OF COUNSEL**

*Law Offices of Martin Eisenberg*, New York City (*Martin Eisenberg* of counsel), for appellants.

*Katten Muchin Rosenman LLP*, New York City (*David A. Crichlow* and *Gregory C. Johnson* of counsel), for Bank of the West, respondent.

*Hoguet Newman Regal & Kenney, LLP*, New York City (*Damian R. Cavaleri, Laura B. Hoguet* and *Jeffrey A. Miller* of counsel), for Mission Capital Advisors, LLC, respondent. ■

*Richard Kibbe & Orbe LLP*, New York City (*Brian S. Fraser, Robyn H. Frumkin, Katherine Kern Harrington* and *Rachel S. Mechanic* of counsel), for Loan Syndications and Trading Association, amicus curiae.

**OPINION OF THE COURT**

RIVERA, J.

Plaintiffs Stonehill Capital Management LLC, Stonehill Institutional Partners, L.P. and Stonehill Master Fund Ltd. (collectively Stonehill) are affiliated commercial entities that seek to enforce the auction sale of a syndicated loan against defendant Bank of the West (BOTW). BOTW concedes that it accepted Stonehill's bid and then refused to transfer the loan, but claims it had no legal obligation to do so because the parties never executed a written sales agreement and Stonehill failed to submit a timely cash deposit. However, these prerequisites are not conditions precedent to formation of the parties' contract and do not render their agreement unenforceable. Therefore, Stonehill has established its entitlement to summary judgment.

## I.

BOTW, a lender of various nonperforming mortgage loans, retained codefendant Mission Capital Advisors, LLC to manage

a competitive online sealed-bid auction of several of these loans. As part of the bid process, in March 2012 Mission issued an Offering Memorandum (Memorandum), which announced its solicitation of indicative bids for the purchase of the loans, individually or in any combination, and invited non-contingent final offers. The auction portfolio included a syndicated loan—with an aggregate principal value of $8,787,141—known to the parties as the "Goett Loan." The Goett Loan is the underlying subject of the parties' dispute.

The Memorandum set forth information about the loan portfolio and the asset pools contained therein. In the description of the "Loan Sale Process," the Memorandum informed interested parties that

> "[a]fter receipt of [the] indicative bids, Mission, in conjunction with the Seller, will select Final Bidders to complete final due diligence before submitting non-contingent offers on the Final Bid Date (the acceptance of which by Seller will require immediate execution of pre-negotiated Asset Sale Agreement (s) by Prospective Bidder accompanied by a 10% non-refundable wire funds deposit)."

The asset sale agreement would be made available for review to final bidders. The Memorandum also included the following disclaimer:

> "The seller reserves the right, at their sole and absolute discretion, to withdraw any or all of the assets from the loan sale, at any time. . . . Only those representations and warranties that are made by the seller to a prospective bidder in a definitive, executed loan sale agreement shall have any legal effect" (capitalization modified).

After Stonehill expressed an interest in the Goett Loan, Mission forwarded a proposed asset sale agreement, referred to as the "Loan Sale Agreement" (LSA). Two days later, on April 18, Stonehill submitted to Mission a $2,363,142 final bid on the Goett Loan. The same day, by separate correspondence, Stonehill informed Mission that the LSA was not the proper document to effectuate a syndicated loan transfer, and offered to "either make the minor modifications required to that docu-

ment to account for the agent's approval process, etc, or use an LSTA syndicated loan document, whichever the Seller prefers."[1]

Mission notified Stonehill by telephone on April 20 that it had submitted the winning bid for the Goett Loan. On April 23, Stonehill sent Mission a modified redlined version of the proposed LSA, purportedly at Mission's request, containing what Stonehill considered to be the necessary technical changes that would enable the LSA to effectuate the sale and assignment of the Goett syndicated loan. Mission's representative replied that it was "a substantially larger markup than I was expecting to see. I can't actually say that our lawyer is going to use it." Then, on April 24, BOTW's counsel sent Mission an email stating that if the Goett Loan was a syndicated credit "the LSTA form agreement is actually pretty good," to which Mission's representative responded that he was "99.9% certain that [Stonehill is] right about this being a syndicated credit."

On Friday, April 27, Mission emailed Stonehill written confirmation that BOTW agreed to the Stonehill bid. The correspondence stated:

> "Subject to mutual execution of an acceptable [LSA], [BOTW] has agreed to the Stonehill . . . bid of:
>
> "Mixed Portfolio - $8,787,141 UPB
>
> "Purchase Price - $2,363,142
>
> "As discussed, counsel representing [BOTW] . . . will be sending you an executable [LSA] . . . by Tuesday, May 1st. An executed signature page and 10% non-refundable deposit is expected no later than 2:00 pm EDT on Wednesday, May 2nd" (emphasis omitted).

The email also included wiring instructions for the deposit and closing.

That same day, BOTW's counsel sent Stonehill an email in which counsel explained that he was previously unaware that the Goett Loan was syndicated and that he "prefer[red] to use LSTA documentation for syndicated credits." He pushed for an early May closing on the loan transfer because "[m]ost trade agents won't approve trades at the end of the month" and said that he would send the trade agreements the following week.

---

**1.** LSTA (Loan Syndications and Trading Association) is a trade association that publishes standardized forms for syndicated loan agreements.

On Friday, May 4, BOTW's counsel was still preparing the documents and initiated a series of email exchanges to move the deal ahead. Counsel first informed Stonehill that he was working on sending the documents by Monday and requested that, "[i]n the meantime," Stonehill send him the term sheet from a previous trade specified by counsel. Stonehill wrote back that the requested term sheet was confidential but that Stonehill would provide an LSTA form reflecting the terms of the Goett Loan transaction, stressing, "[w]e hope that this arrangement will be acceptable to you and will enable us to move forward to close quickly." BOTW's counsel responded that he "assumed as much" and it was "fine to proceed as [Stonehill] indicated."

As promised, two days later Stonehill sent the LSTA form to BOTW's counsel with the terms for the loan transaction and related documents. In this same correspondence, Stonehill informed counsel that it was forwarding the credit agreement transfer forms to Wells Fargo, the credit agreement agent, and this was a necessary step to complete and record the transfer of the Goett Loan to Stonehill.

On May 8, Stonehill informed BOTW's counsel that Wells Fargo approved the credit transfer forms. Under the credit agreement, Stonehill needed the promissory note endorsed in order to close on the Goett Loan, so Stonehill also sent counsel a standard allonge form for the promissory note on the Goett Loan issued to BOTW.

Around this time, BOTW learned that Stonehill was refinancing the Goett Loan. This would apparently increase the value of the loan, which led BOTW to consider its options with respect to the loan sale. An internal BOTW memorandum circulated on May 10 detailed both the refinancing and the auction sale to Stonehill. The memorandum explained that

> "there is a question as to the direction [BOTW] should take; sale or not to sale [sic], given that no formal written commitments are executed between [BOTW]/Mission Capital and Stonehill that would obligate [BOTW] to sale [sic] the Goett Note. Fact remains that [BOTW] acted in good faith and has verbally committed to the Goett Note sale to Stonehill."

It further stated that Stonehill had proceeded with various steps to finalize the refinancing and Stonehill funding was highly likely.

On May 14, Stonehill contacted BOTW's counsel for an update. Counsel, apparently surprised by Stonehill's inquiry, forwarded the email to Mission. Then on May 16, Mission informed Stonehill by telephone that BOTW would not proceed with the trade. Over a week later, on May 25, Mission forwarded to Stonehill a May 18 email from BOTW to Mission declaring that it would not sell to Stonehill:

"[BOTW] will not proceed with this trade because it has no obligation to do so. There are no agreements (oral or written) between [BOTW] and Stonehill Capital. The Offering Memorandum specifically permits [BOTW] to withdraw any loan from the auction at any time. Specifically, it states 'The Seller reserve[s] the right, at their sole and absolute discretion, to withdraw any or all of the assets from the loan sale, at any time.' In addition, Mission Capital's bid response e-mail to Stonehill conditioned [BOTW's] response upon the execution of a definitive loan sale agreement."

As a consequence of the refinancing and the cancellation of the sale to Stonehill, on June 21 BOTW received $4,197,441 on the Goett Loan, an excess of approximately $1.8 million over Stonehill's bid.[2]

Stonehill commenced the present action against BOTW and Mission, alleging breach of contract and breach of the implied covenant of good faith and fair dealing, and seeking indemnification. In its amended complaint, Stonehill added a cause of action for unjust enrichment and demanded $1.5 million in damages.

Supreme Court denied BOTW's motion to dismiss and cross motion for summary judgment, and granted Stonehill's motion for summary judgment on the breach of contract cause of action (*Stonehill Capital Mgt., LLC v Bank of the W.*, 2014 NY Slip Op 30751[U] [Sup Ct, NY County 2014]). Supreme Court held that because the purchase and sale agreement was pre-negotiated, BOTW's acceptance of Stonehill's bid created a binding contract. BOTW appealed and the Appellate Division reversed, granted BOTW's cross motion for summary judgment and dismissed the complaint as against BOTW, holding that Stonehill had failed to establish a valid acceptance (*Stonehill Capital Mgt., LLC v Bank of the W.*, 127 AD3d 429 [1st Dept

2. The amount of damages is not at issue in this appeal.

2015]). We granted Stonehill leave to appeal (*Stonehill Capital Mgt., LLC v Bank of the W.*, 26 NY3d 909 [2015]).

## II.

### A. Summary Judgment Standard

It is well established that "the proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *see also William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh*, 22 NY3d 470, 475-476 [2013]; CPLR 3212 [b]). Once the movant makes the proper showing, "the burden shifts to the party opposing the motion for summary judgment to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action" (*Alvarez*, 68 NY2d at 324). The "facts must be viewed in the light most favorable to the non-moving party" (*Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012] [internal quotation marks omitted]). However, bald, conclusory assertions or speculation and "[a] shadowy semblance of an issue" are insufficient to defeat summary judgment (*S.J. Capelin Assoc. v Globe Mfg. Corp.*, 34 NY2d 338, 341 [1974]), as are merely conclusory claims (*Putrino v Buffalo Athletic Club*, 82 NY2d 779, 781 [1993]).

### B. Breach of Contract Claim

To establish a prima facie breach of contract, Stonehill must show that BOTW breached a binding agreement between the parties, which damaged Stonehill (*see Palmetto Partners, L.P. v AJW Qualified Partners, LLC*, 83 AD3d 804, 806 [2d Dept 2011]; *Fischer & Mandell, LLP v Citibank, N.A.*, 632 F3d 793, 799 [2d Cir 2011]). To form a binding contract there must be a "meeting of the minds" (*Farago v Burke*, 262 NY 229, 231 [1933]), such that there is "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (*Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584, 589 [1999]). In determining whether the parties intended to enter a contract, and the nature of the contract's material terms, we look to the "objective manifestations of the intent of the parties as gathered by their expressed words and

deeds" (*Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397, 399 [1977]). "[D]isproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain" (*id.* at 399-400). With respect to auctions, the general rule is that a seller's acceptance of an auction bid forms a binding contract, unless the bid is contingent on future conduct (*City of New York v Union News Co.*, 222 NY 263, 270 [1918]). While an auction can be conditional, meaning property can be withdrawn after the close of bidding, it will not be deemed conditional absent explicit terms (*see Slukina v 409 Edgecombe Ave. Hous. Dev. Fund Corp.*, 2013 NY Slip Op 31966[U], *8 [Sup Ct, NY County 2013]).

Stonehill maintains that BOTW's acceptance of its bid constitutes a contract to sell the Goett Loan. In response, BOTW asserts it conditioned the sale on the parties' execution of a written agreement and Stonehill's submission of a 10% deposit, neither of which was satisfied prior to BOTW's withdrawal from the transaction. We conclude, based on the totality of the parties' actions and communications, that they agreed to an enforceable contract, with express material terms and post-formation requirements.

BOTW, through Mission as its auctioneer, solicited bids on a loan portfolio and its component parts. The Offering Memorandum stated that the bids were non-contingent final offers that, if accepted by the seller, required execution by the bidder of a pre-negotiated asset sale agreement and an accompanying 10% deposit. The Memorandum additionally informed prospective bidders that the loans sold at auction were "subject only to those representations and warranties explicitly stated in the Asset Sale Agreement," which was included with the Memorandum. Thus, the terms of the sale were preset.

In response, Stonehill submitted a bid and separately informed Mission that the LSA included with the Memorandum was inappropriate for the type of asset that was the subject of the auction, specifically a syndicated credit facility. Stonehill offered to make the necessary modifications or use LSTA documents instead. When BOTW accepted Stonehill's offer it confirmed the bid in a correspondence setting forth the sale price, the specific loan to be sold, the timing of the closing, and the manner of payment and wire transfer instructions—terms

material to the agreement. BOTW in no way indicated that the LSTA form or any modifications were unacceptable. At no time during the period between when BOTW accepted Stonehill's bid and when it withdrew from the transaction did BOTW communicate its objection to the LSTA form that Stonehill had sent to BOTW's counsel or indicate that the proposed modifications were "deal breakers." In fact, counsel emailed Stonehill that once he became aware that the asset was a syndicated loan, he too preferred to use the LSTA documentation.

In future correspondence counsel did not mention any problems with the LSTA form that Stonehill had sent, but instead requested documentation from Stonehill to move the transaction along towards a mid-May closing date. Specifically, in the Friday, May 4th email thread, BOTW's counsel said he was working on getting the documents to Stonehill the following Monday and requested a term sheet to further the process. After Stonehill responded that it could not return the specific term sheet requested because of confidentiality provisions, offering instead to send an LSTA form for the Goett Loan transaction, BOTW's counsel informed Stonehill that it could proceed as described.

The totality of the parties' conduct and the "objective manifestations" of their intent are evidenced by BOTW's inclusion of pre-negotiated auction terms in the Offering Memorandum, BOTW's acceptance of Stonehill's bid in correspondence that communicated the terms of the purchase and the date and instructions for the closing, the email exchanges between BOTW's counsel and Stonehill which indicated the sale was moving ahead and included references to documents necessary for closing the transaction, and BOTW's utter failure to identify or explain any objections to the LSTA form prior to the May 18th correspondence announcing its withdrawal from the sale. This established the parties' intent to enter a binding agreement in which BOTW would sell the Goett Loan to Stonehill at the accepted final price.

BOTW argues that an executed signed agreement and a 10% deposit were preconditions to the contract which were never fulfilled and so BOTW was not bound to sell the Goett Loan to Stonehill. It claims that, at best, the parties had an unenforceable agreement to agree. BOTW relies on the April 27th email to Stonehill, which provides that "[s]ubject to mutual execution of an acceptable Loan Sale Agreement, [BOTW] has agreed to the Stonehill . . . bid" and which also set a due date for the

executed signature page and the 10% deposit. BOTW argues the "subject to" language made the sale contingent on satisfaction of these two unmet conditions. This argument is unsupported by the record.

"[I]f the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed" (*Scheck v Francis*, 26 NY2d 466, 469-470 [1970]). Certainly, "when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent" (*R.G. Group, Inc. v Horn & Hardart Co.*, 751 F2d 69, 75 [2d Cir 1984] [applying New York contract law]).

Such a forthright, reasonable signal is not obvious from the mere inclusion in an auction bid form of such formulaic language that the parties are "subject to" some future act or event. Less ambiguous and more certain language is necessary to remove any doubt of the parties' intent not to be bound absent a writing (*see e.g. Emigrant Bank v UBS Real Estate Sec., Inc.*, 49 AD3d 382, 383 [1st Dept 2008] [" 'Subject to' in the bid form did not unmistakably condition assent on the execution of a definitive agreement at some later juncture"]; *Bed Bath & Beyond Inc. v IBEX Constr., LLC*, 52 AD3d 413, 414 [1st Dept 2008] ["use of the language 'subject to' in the (letter of intent), and reference to the execution of a construction agreement as a 'qualification,' do not amount to an express reservation of the right not to be bound"]; *cf. Eastern Consol. Props., Inc. v Morrie Golick Living Trust*, 83 AD3d 534, 534 [1st Dept 2011] ["deal memorandum entered into by the parties, which expressly stated, 'This memo shall memorialize the terms of the deal that have been accepted, subject to the signing of a mutually acceptable Contract of Sale,' is a classic example of an 'agreement to agree' "]).

We disagree with BOTW that the "subject to" language in the April 27th email clearly expresses an intent not to be bound to the sale of the Goett Loan. This email stated that closure of the transaction required execution of a signed document and Stonehill's tender of the 10% deposit. That, however, is not the same as a clear expression that the parties were not bound to consummate the sale and that BOTW could withdraw at any time, for any reason. Nor did BOTW make known its desire for an unrestricted exit from the deal before accepting Stonehill's bid or anytime before it withdrew from the transaction.

This was never made explicit before the bid was accepted either. There is a difference between conditions precedent to performance and those prefatory to the formation of a binding agreement. In *IDT Corp. v Tyco Group, S.A.R.L.* the Court explained the legal distinction:

> "[A] condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises. Most conditions precedent describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract, a situation to be distinguished conceptually from a condition precedent to the formation or existence of the contract itself" (*IDT Corp. v Tyco Group, S.A.R.L.*, 13 NY3d 209, 214 [2009] [internal quotation marks and citations omitted]).

Here, the signed writing and deposit were post-agreement requirements necessary for the consummation of the transfer, as established by the continued exchange of documents necessary to the asset transfer. To adopt BOTW's argument would mean that the auction was neither final nor binding—in direct contravention of the auction sale terms and the usual manner in which reserve auctions proceed.

*Truman Capital Advisors LP v Nationstar Mtge., LLC* (2014 WL 4188090, 2014 US Dist LEXIS 118246 [SD NY, Aug. 25, 2014, No. 13 Civ 5945 (NRB)], *affd* 599 Fed Appx 6 [2d Cir 2015]), cited by BOTW, is distinguishable. In that breach of contract action, Truman bid on loans put up for auction by Nationstar. Nationstar reneged, relying on language in the auction terms that "[n]o obligation to sell shall be binding on Seller unless and until a written contract of sale or loan sale agreement is signed and delivered by Seller" (2014 WL 4188090, *3, 2014 US Dist LEXIS 118246, *7). The court held that Nationstar's "right to reject the winning bid was implicitly reserved through the inclusion of the term requiring that Nationstar return a signed contract of sale or loan sale agreement in order for the transaction to be consummated" (2014 WL 4188090, *5, 2014 US Dist LEXIS 118246, *13). The Second Circuit affirmed, reiterating that the clause in the auction terms prevented Nationstar from being forced to sell even after Truman was determined to be the winning bidder (*Truman Capital Advisors LP v Nationstar Mtge., LLC*, 599 Fed Appx 6, 7 [2d Cir 2015]).

By comparison, the Memorandum and the April 27th email are not affirmative declarations foreclosing a sale "unless and until a written contract . . . is signed and delivered." Instead, the language in these documents requires that the sale be completed upon the execution of a signed writing and the tender of the 10% deposit—post-agreement requirements the parties were obliged to perform pursuant to an existing agreement. The fact that the parties anticipate and identify future events necessary to close the sale is not the legal equivalent of an intent to delay formation of a binding contract absent the passage of those events.

Furthermore, there is no indication that these events were an actual obstacle to the sale. BOTW proffered no evidence to suggest that Stonehill refused to enter a signed agreement or to submit the deposit. Quite the opposite. Stonehill was responsive to all of BOTW's requests for documentation, expressed its eagerness to close the deal, took necessary steps to achieve that end (including securing approval of the credit agreement from Wells Fargo), and never implied its inability or unwillingness to turn over the deposit.[3]

BOTW's withdrawal was not without consequences for Stonehill, which suffered losses totaling over $1.8 million, reflecting the difference between the refinanced Discounted Payoff proceeds on account of the loan received by BOTW ($4,197,441) and the accepted bid sale price ($2,363,142). In other words, BOTW's breach of contract resulted in Stonehill not being able to realize the increased valuation of the Goett Loan.

We conclude therefore that Stonehill met its prima facie burden on summary judgment by showing that BOTW accepted Stonehill's bid to purchase the Goett Loan and the parties entered a binding agreement to complete the sale, BOTW breached that agreement, and the breach caused Stonehill to suffer monetary damages.[4] Moreover, Stonehill asserted—and

---

3. Additionally, BOTW's internal memorandum acknowledged that it had "verbally committed to the Goett Note sale to Stonehill" and suggests the reason the sale did not go through was BOTW's desire to increase its revenue from the sale, not failure to comply with the preconditions.

4. We reject any argument by BOTW that it is not bound to its agreement with Stonehill based on the Memorandum disclaimer that BOTW reserved the right at its sole discretion to withdraw any or all assets from the sale at any time. Read in context, the disclaimer concerns BOTW's ability to withdraw assets from the "sale," and not whether it may withdraw an acceptance of an offer.

BOTW did not dispute—that Stonehill was ready, willing and able to close.

In response, BOTW failed to establish the existence of material issues of fact. This is not a case where the parties' intentions present a question of fact that prevents summary judgment (*see Darmento v Pacific Molasses Co.*, 81 NY2d 985, 988 [1993]; *Hopfan v Harris*, 54 NY2d 843, 845 [1981]). Here the "totality of the parties' conduct," and the objective manifestations of the parties' intent as evidenced by their expressed words and deeds, establishes as a matter of law the existence of the agreement. In addition to the acceptance, the correspondence, and the LSTA form exchange, the clear objective of both parties upon the acceptance of the offer was to sell the Goett Loan to Stonehill for the bid amount. While that objective remained unchanged for Stonehill, BOTW reconsidered the sale—not because of the failure to execute a written agreement or because Stonehill had not tendered the 10% deposit, but because BOTW concluded it would make more money by reneging on the sale. That choice was a breach of its agreement with Stonehill.

## III.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed, with costs, and the judgment of Supreme Court in favor of the Stonehill plaintiffs on their breach of contract claim against BOTW reinstated.

Chief Judge DiFiore and Judges Pigott, Abdus-Salaam, Stein, Fahey and Garcia concur.

Order, insofar as appealed from, reversed, with costs, and judgment of Supreme Court, New York County, in favor of plaintiffs on their breach of contract claim against defendant Bank of the West reinstated.