Harris v Schreibman (2021 NY Slip Op 06724)





Harris v Schreibman


2021 NY Slip Op 06724


Decided on December 2, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:December 2, 2021

529503
[*1]Shannon E. Harris, Also Known as Shannon E. Schreibman, Respondent- Appellant,
v
Julian D. Schreibman, Appellant- Respondent.

Calendar Date:October 21, 2021

Before:Garry, P.J., Egan Jr., Aarons, Pritzker and Colangelo, JJ.

Law Office of Cappy Weiner, Kingston (Cappy Weiner of counsel), for appellant-respondent.
Van DeWater & Van DeWater, LLP, Poughkeepsie (Danielle E. Strauch of counsel), for respondent-appellant.



Pritzker, J.
(1) Cross appeals from an amended judgment of the Supreme Court (Lambert, J.), entered May 15, 2019 in Ulster County, ordering, among other things, equitable distribution of the parties' marital property, upon decisions of the court, (2) appeals from two orders of said court, entered September 19, 2019 and December 18, 2019 in Ulster County, which, among other things, vacated part of the parties' oral stipulation and partially denied defendant's motion to reargue and renew, and (3) appeal from an amended order of said court, entered February 4, 2020, which awarded plaintiff counsel fees.
Plaintiff (hereinafter the wife) and defendant (hereinafter the husband) were married in September 2004 and have three children together — one born in 2008 and twins born in 2010. By way of relevant background, the parties' marital relationship informally ended in 2012, but they elected to defer formal divorce proceedings and continued to share a residence and co-parent their children. Notably, the husband and the wife each owned a one-third share of the marital residence, and the wife's mother owned the remaining one-third interest in it. The wife's mother also provided the parties with $50,000 to renovate an unfinished space on the property into a home office and rental unit. In 2016, the parties reached a financial arrangement in which they would share the cost of the mortgage proportionate to their incomes, the wife would pay for health insurance and a live-in au pair and would receive the income from the rental unit, and the husband would pay the remaining expenses. In late 2016, the wife lost her job, received a severance package and began focusing on her rental operation through Airbnb; she also ran for election as Esopus Town Supervisor. At the same time, the husband, who was a partner at a New York City law firm, ran for election for the position of Justice of the Supreme Court. Both parties were elected in November 2017, and both of their incomes were reduced as a result.
The wife commenced this action for divorce and equitable distribution of marital property in June 2017. The husband answered the complaint and counterclaimed for the same relief. Prior to trial, the parties agreed on joint legal custody for their three children with each parent getting physical custody 50% of the time. The parties also entered a pretrial oral stipulation in which, among other things, the husband's one-third interest in the marital residence was transferred to the wife and the husband waived any interest in the wife's Airbnb business, and the husband's expected distribution from his capital account with his former law firm, the parties' retirement accounts and their credit card debts were equitably distributed. Trial was then held on the remaining issues, including child support, maintenance and the repayment of $50,000 to the wife's mother. After trial, the husband moved to vacate the portion of the oral pretrial stipulation setting forth the exact figure [*2]of his capital account and the exact figure of the wife's credit of such, and to reopen proof as to the value of that account. The wife opposed that motion. Supreme Court granted the husband's motion and held a hearing regarding the value and distribution of the husband's capital account.
By amended judgment entered May 15, 2019, Supreme Court, among other things, granted the wife spousal maintenance and child support, and ordered the husband to maintain health insurance for the children, pay a portion of the uninsured medical expenses and pay a portion of the cost of an au pair. After determining that the $50,000 from the wife's mother was a loan, not a gift, the wife was ordered to pay the entire $50,000, but she was to receive a $25,000 distributive credit from the husband. The court denied the wife's request for prejudgment counsel fees.
The husband subsequently moved to renew and reargue with respect to various provisions of the May 15, 2019 amended judgment, including those requiring him to pay spousal maintenance, child support and health insurance and claiming that Supreme Court overlooked and did not address removal of the husband's name from the note and mortgage encumbering the marital residence. The wife cross-moved for counsel fees in conjunction with the postjudgment motion. By order entered September 19, 2019, Supreme Court vacated the specific dollar figure set forth in the parties' pretrial stipulation with respect to the husband's capital account, adjusted that figure to comport with the testimony heard at the hearing and ordered the husband to pay the wife half of that adopted amount. Three months later, in a December 18, 2019 order, the court partially granted the husband's motion to reargue and renew by recalculating the amount of maintenance that the husband owed the wife and, as a result, adjusted the amount of child support owed to reflect those changes. The court also ordered that a hearing be held on the wife's cross motion for postjudgment counsel fees, which was subsequently held. By order entered February 4, 2020, the court awarded the wife $5,000 in counsel fees. The husband and the wife cross-appeal from the May 15, 2019 amended judgment of divorce, and the husband also appeals from the September 19, 2019, December 18, 2019 and February 4, 2020 orders.
The husband raises several arguments regarding Supreme Court's award of maintenance to the wife. "'[I]n any matrimonial action, the court, upon application by a party, shall make its award for post-divorce maintenance pursuant to the' guidelines set forth in the statute" (Hughes v Hughes, 198 AD3d 1170, ___, 2021 NY Slip Op 05765, *2 [2021], quoting Domestic Relations Law § 236 [B] [6] [a]). "The court shall order the post-divorce maintenance guideline obligation up to the income cap in accordance with [the statutory formula], unless the court finds that the post-divorce maintenance guideline obligation is unjust or inappropriate, which finding shall [*3]be based upon consideration of any one or more of the" specifically enumerated factors set forth in the statute (Domestic Relations Law § 236 [B] [6] [e] [1]).
The husband first argues that the wife is not a candidate for maintenance because the wife has the education, skills and work history to be self-sufficient. Supreme Court awarded the wife, pursuant to the statutory guidelines, maintenance in the amount of $1,963.92 monthly, or $23,567 annually, for a duration of 3 years and 10 months.[FN1] The court explicitly stated that it considered that factors in Domestic Relations Law § 236 (B) (6) (e) and declined to deviate from the guidelines. Although the wife is earning substantially less money than she did in her previous employment, the record reflects that she lost her job through no fault of her own and was reluctant to take a position that would require her to commute into New York City or travel a lot, taking her away from the children. The husband testified that this is the same reason that he ran for the judgeship to which he was elected, a position that pays less than half of what he was previously earning while working as a partner in a New York City law firm. Certainly, it seems unjust and inappropriate to penalize the wife for making the decision to earn significantly less money for the same reason as the husband. Additionally, although the wife is arguably self-sufficient, the court properly considered the standard of living that the parties established during the marriage in determining that the maintenance award was not unjust or inappropriate (see generally St. Denny v St. Denny, 185 AD3d 1246, 1247 [2020]; Pfister v Pfister, 146 AD3d 1135, 1137 [2017]). As such, we do not discern an abuse of discretion in Supreme Court awarding the wife maintenance in accordance with the statutory guidelines.
Nor do we discern any abuse of discretion in Supreme Court ordering maintenance for 3 years and 10 months, which is the maximum length of time under the advisory schedule (see Domestic Relations Law § 236 [B] [6] [f] [1]).[FN2] Contrary to the husband's arguments on appeal, the record reflects that, in its findings of fact and conclusions of law, the court noted, among other things, the ages of the parties, the length of the marriage, information regarding the children, the parties' educational levels and past and current careers and incomes. In awarding maintenance and setting the duration, the court expressly stated that it considered the factors in Domestic Relations Law § 236 (B) (6) (e) and detailed the factors it found most compelling. Thus, because the court provided a "reasoned analysis of the factors it ultimately relie[d] upon in awarding maintenance" and setting its duration, we decline to disturb the maintenance award (Robinson v Robinson, 133 AD3d 1185, 1186 [2015] [internal quotation marks and citation omitted]; see Domestic Relations Law § 236 [B] [6] [f] [2]; Orioli v Orioli, 129 AD3d 1154, 1155 [2015]).
The husband next [*4]contends that Supreme Court erred in setting the wife's income as $59,000. "[A] court is not bound by a party's account of his or her own finances, and where a party's account is not believable, the court is justified in finding a true or potential income higher than that claimed. The trial court is afforded considerable discretion in determining whether to impute income to a party, and the court's credibility determinations will be accorded deference on appeal" (Ferrante v Ferrante, 186 AD3d 566, 569 [2020] [internal quotation marks, brackets and citations omitted]; see Pfister v Pfister, 146 AD3d at 1136). The record establishes that the wife earned, on average, $134,000 per year at her prior job.[FN3] However, at the time of the hearing, the wife was earning $35,000 as the Town Supervisor and the court imputed $24,000 per year, or $2,000 per month, in rental income from the wife's Airbnb business, for a total of $59,000 per year. The husband contends that the court should have imputed $90,000 per year in income to the wife — $35,000 as salary plus approximately $55,000 in income from her Airbnb business.
At trial, the wife testified regarding the income that she had earned through Airbnb. She explained that the rentals range in price from $102 to $185 per day but that they are not rented every day. In fact, she testified that, although they are rented almost every weekend, there are fewer midweek renters. She also testified that, after cleaning expenses, repairs, food and other expenses, she nets about $2,000 per month. On cross-examination, the husband questioned her regarding bank account deposits for October through December 2017 totaling approximately $13,700. The wife testified that the payments were from a four- to five- month time span during peak season and did not account for refunds given to customers who did not show up or because something went wrong and they were entitled to a credit. Supreme Court considered all of the evidence and implicitly found credible the wife's testimony that, after expenses and taxes, she nets $2,000 per month. The husband did not provide any testimony or exhibit that directly refuted this testimony. Thus, we defer to Supreme Court's credibility determinations and find no basis to disturb its decision to impute the wife's income as $59,000 per year (see Seale v Seale, 149 AD3d 1164, 1170 [2017]; Cornish v Eraca-Cornish, 107 AD3d 1322, 1325 [2013]). Finally, as to the husband's remaining contention regarding maintenance, we disagree that Supreme Court should have adjusted the maintenance award in light of the Tax Cuts and Jobs Act of 2017 as the husband failed to raise this argument at trial or in his posttrial brief.[FN4]
We do, however, agree with the husband's assertion that Supreme Court erred in failing to require the wife to contribute to the cost of the children's health insurance and in failing to prorate each party's share of the premiums as required by the Child Support Standards Act (see [*5]Domestic Relations Law § 240 [1-b]). The Child Support Standards Act provides that, "[w]here the child[ren] [are] presently covered by health insurance benefits, the court shall direct in the order of support that such coverage be maintained" (Domestic Relations Law § 240 [1] [c] [1]). "[T]he cost of providing health insurance benefits shall be prorated between the parties in the same proportion as each parent's income is to the combined parental income" (Domestic Relations Law § 240 [1-b] [c] [5] [ii]). "If the non-custodial parent is ordered to provide such benefits, the custodial parent's pro rata share of such costs shall be deducted from the basic support obligation" (Domestic Relations Law § 240 [1-b] [c] [5] [ii]). Although Supreme Court failed to deduct the husband's pro rata share of the health insurance from the basic child support obligation, the record is sufficient to allow us to adjust the child support accordingly.
To that end, in the December 18, 2019 order, Supreme Court determined that the parties' combined parental income for child support purposes was $246,574.50, with 69% attributed to the husband and 31% to the wife. After finding that the applicable child support percentage was 29%, and applying the statutory cap, the court found that the presumptive amount of child support attributable to the husband was $29,614.80 per year, or $2,467.90 per month.[FN5] According to the record, the husband paid $224.29 biweekly for family health insurance, totaling $5,831.54 per year; for individual health insurance, he would have to pay $57.33 biweekly, totaling $1,490.58 per year. The children's health insurance thus costs the husband an additional $4,340.96 per year, of which the wife should pay 31% per her prorated obligation, amounting to $1,345.70 annually. Subtracting this prorated share from the husband's support obligation of $29,614.80 per year, the husband's child support obligation is $28,269 per year or $2,356 per month. Accordingly, we adjust the husband's monthly child support obligation to $2,356 plus 69% of all unpaid health care and medical and special educational costs.
We now turn to the husband's contention that the wife's stipulation to purchase his interest in the marital residence encompassed an obligation to remove him from the note and mortgage. "A stipulation of settlement entered into in open court is a contract subject to the principles of contract interpretation" (Grandy v McKay, 82 AD3d 1470, 1471 [2011] [citations omitted], appeal dismissed 17 NY3d 782 [2011]). The court's function is "to interpret the stipulation of settlement and glean the intent of the parties from the plain language of the stipulation" (Mayefsky v Mayefsky, 184 AD2d 954, 955 [1992], appeal dismissed 80 NY2d 924 [1992]; accord Bell v White, 77 AD3d 1241, 1243 [2010], lv dismissed 16 NY3d 888 [2011]). Before trial, the parties orally stipulated that the husband would transfer his one-third interest to the wife and, after subtracting [*6]the balance due on the mortgage, the husband was to receive a credit of approximately $67,000 for the transfer. Following that transfer, the wife would have full ownership of the marital home, subject to the mortgage. The amended judgment reiterates as such. There was no discussion either on the record or in Supreme Court's amended judgment as to whether the wife would remove the husband as an obligor from the mortgage. However, in reviewing the record, it does not appear that it was the wife's intention to have the husband burdened by the payments due under the mortgage.[FN6] Thus, we modify the amended judgment to include language that the wife shall defend, indemnify and hold the husband harmless from any and all payments due under the mortgage.
The husband also contends that Supreme Court erred in treating the $50,000 given to the parties by the wife's mother as a loan and in granting the wife a $25,000 credit. "[I]t is well settled under the common law of this [s]tate that a party claiming that a transfer is a gift has the burden of proof by clear and convincing evidence that the gift was made with the requisite donative intent" (Phelps v Phelps, 128 AD3d 1545, 1547 [2015]; see Golding v Gottesman, 41 AD3d 430, 430 [2007]). Cases in which divorcing parties dispute whether money given by one spouse's parents was a loan or a gift rely on the facts adduced at trial, such as the history of gift-giving by the parent and evidence of an intent to repay the parent (see Vitale v Giaimo, 103 AD3d 835, 838-839 [2013]; Burtchaell v Burtchaell, 42 AD3d 783, 786 [2007]). Notably, however, a loan is a contract and the principles of contract apply. "To form a binding contract there must be a meeting of the minds, such that there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (Stonehill Capital Mgt. LLC v Bank of the W., 28 NY3d 439, 448 [2016] [internal quotation marks and citations omitted]). "[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable" (Tompkins Fin. Corp. v John M. Floyd & Assoc., Inc., 144 AD3d 1252, 1253 [2016] [internal quotation marks and citation omitted]).
At trial, the wife's mother testified about providing the parties with $200,000 to purchase the marital residence and her receiving a one-third share as consideration. She testified that she also gave the parties more money in May 2016, totaling $50,000 between two checks, to make some improvements to their residence. The wife's mother stated that there were no writings between her and the parties evidencing the terms under which the $50,000 was to be repaid, including when it would be repaid, but she testified that discussions took place "on a couple of occasions." For example, she testified that there was a telephone conversation between her and the parties in April 2016 in which she discussed with them how the money was to be [*7]repaid, and, later, she testified that she spoke with the parties in November 2017 about creating 529 savings plans for the children's educations that the parties would pay into. The wife's mother testified that she and the parties "never agreed on . . . how the final pay back was going to occur." Instead, according to the wife's mother, they "agreed it was a loan in [her] mind," which was consistent with what she had written on the checks. The wife's mother also testified that the wife paid $100 per month from October or November 2017 until February 2018, totaling approximately $500. She explained that the wife had paid her back with checks, rather than paying into 529 accounts, and that she did not retain copies of the checks. The wife's mother also wrote a letter to the husband and his attorney in January 2018 to inform him that he was obligated to pay back the $50,000, but she did not receive a response.
The husband agreed that the wife's mother wrote two checks, totaling $50,000. Describing a conversation with the wife, the husband explained that he would not borrow any more money from the wife's mother, he "wasn't going to be financially obligated to [the wife's] mother," and he refused to agree to a loan. According to the husband, the wife begged him to agree to the $50,000 from the mother "and she said on more than one occasion [that they would] never have to pay this money back, [and the wife's] mother will accept if [they] just put money away for the kids for college." According to the husband, the wife told him that the money for the college funds could be $50 to $100 at a time, with no time limit. With respect to the November 2017 conversation with the wife's mother, the husband testified that he reminded her that "the deal was not to pay [her] back, it was just to put money away for college," to which she agreed. The wife testified that she approached her mother for $50,000 for renovations in the marital residence. According to the wife, the mother was "very clear that it was a loan," and she "[threw] out the idea that part of the repayment could occur in the form of direct money from [the parties] as repayment into . . . 529 [accounts] held by her." The wife stated that the husband was present during those conversations. Furthermore, with respect to the $200,000 that the wife's mother provided for the down payment on the marital residence, the wife testified that they did not discuss those funds being repaid, but they added the wife's mother as a co-owner on the deed. The wife also admitted that she was gifted her mother's one-third share in the marital residence.
Based on the foregoing, the husband met his burden of showing that the intent of the wife's mother was for the $50,000 to be a gift. Although the wife's mother gave the money to the parties in May 2016, there is no evidence that she attempted to collect on that alleged debt until she wrote the husband and his attorney a letter in January 2018. The wife's [*8]mother apparently discussed the payment with the parties in November 2017, and they talked about putting the money into 529 accounts. However, there is no evidence that she ever created 529 accounts for the children or that she demanded payment at that time. There is also no evidence that she sought to collect the money from the wife when she received a substantial severance payment in late 2016. Although the wife allegedly paid her mother $500 in 2017 and 2018, no proof of the checks or their deposits were introduced into evidence, and the mother admitted that they were not put into 529 accounts. Furthermore, the payments from the wife suspiciously began at the same time that she commenced this action for divorce, ceased after just a few months and were in relatively low amounts compared to the total outstanding balance of what was allegedly loaned to the parties. Additionally, the wife's mother has a history of gifting the parties sums of money without repayment. Taken together, the evidence shows that the wife's mother did not intend to be repaid the $50,000 and, even if she did, her intent was for those payments to go into 529 accounts for the children, not to receive them as cash payments. Accordingly, Supreme Court erred in determining that the parties were responsible for repaying the loan to the wife's mother and awarding the wife a $25,000 credit from the husband for such payment (see Phelps v Phelps, 128 AD3d at 1548; Vitale v Giaimo, 103 AD3d at 839).
Next, both parties argue that Supreme Court wrongly concluded that they violated the automatic stay orders and, at the same time each maintains that the other party wastefully dissipated marital property by violating them. When the wife commenced this divorce action in 2017, automatic orders went into effect which, pursuant to the Domestic Relations Law, provided that "[n]either party shall sell, transfer, encumber, conceal, assign, remove or in any way dispose of, without the consent of the other party in writing, or by order of the court, any property . . . individually or jointly held by the parties, except in the usual course of business, for customary and usual household expenses or for reasonable [counsel] fees in connection with [the] action" (Domestic Relations Law § 236 [B] [2] [b] [1]). Additionally, neither party shall withdraw or in any way dispose of "assets held in any individual retirement accounts" (Domestic Relations Law § 236 [B] [2] [b] [2]). The orders also provided that "[n]either party shall incur unreasonable debts" after commencement of the action (Domestic Relations Law § 236 [B] [2] [b] [3]).
Testimony at the trial reveals that, in either March or April 2018, the husband received an $81,000 wire transfer from his former firm and he used about $30,000 or $35,000 of that money to pay taxes. The husband also testified that he used $38,000 from that payment to pay back campaign expenses that were incurred during the course of his November 2017 political [*9]campaign. The wife testified that she was not aware that the husband received and utilized these funds. There was also testimony about the wife's severance package, the total of which was $79,961.54 and included a check in the amount of $50,996.99 received in December 2016. The wife testified that she told the husband right away that her employment had been terminated and that she would receive a severance payment. When asked what she did with the severance check, the wife admitted that she took it to the bank and cashed it, and she put the funds in her safe because she "simply wanted to have access to [her] money." She testified that she used the cash to make various payments for improvements to the rental units and to pay cost of living and everyday expenses, and she paid for a trip to Brazil with the children, the parties' significant others and the au pair before the divorce action was filed. The wife testified that, in addition to that check, her severance included two additional checks for unused vacation time, money required to purchase COBRA health insurance and as part of her bonus payment for the end of the year. The wife admitted that she did not enroll in COBRA. The wife also testified that she had a Wealth Builder account and a 401(k) plan and, at the time that she filed the divorce action, there were not any liens or encumbrances on them. The wife stated that, in the spring of 2018, she withdrew money from those accounts to pay some debts that had been accumulating over many years and to pay $7,000 in legal fees. Although the wife believed that the husband orally consented to her withdrawals, a letter from the husband's counsel to the wife, admitted into evidence, revealed that the husband did not consent to those withdrawals.
Supreme Court properly concluded that when the husband transferred $38,000 in cash to pay off campaign debts, he directly controverted the automatic order set forth in Domestic Relations Law § 236 (B) (2) (b) (1). Similarly, the wife did not have the husband's written consent to remove money from her retirement accounts to pay off debts (see Domestic Relations Law § 236 [B] [2] [b] [2]). As such, Supreme Court properly concluded that both the husband and the wife violated the automatic orders (see Martin v Martin, 178 AD3d 1339, 1341 [2019]). As for the wife's use of the severance payment, the court properly declined to consider this wasteful dissipation of marital property because she used those funds for renovations to the marital residence, where both parties resided, food, outings with the children and other living expenses (see Carvalho v Carvalho, 140 AD3d 1544, 1547 [2016]). However, it is clear from the testimony that, despite violating the automatic orders, the parties did so to pay off debts, pay taxes, cover everyday expenses and pay legal fees. As such, Supreme Court properly canceled out each party's alleged wasteful dissipation of the assets in coming to its determination on equitable [*10]distribution.
Finally, both parties contend that Supreme Court erred in its determinations regarding counsel fees. "When exercising its discretionary powers in this regard, a court should review the financial circumstances of both parties together with all the other circumstances of the case, which may include the relative merit of the parties' positions as well as the complexity of the case and the extent of legal services rendered" (Bell-Vesely v Vesely, 180 AD3d 1272, 1276 [2020] [internal quotation marks and citations omitted]). Notably, there is "a rebuttable presumption that counsel fees shall be awarded to the less monied spouse" (Domestic Relations Law § 237 [a]; see Button v Button, 165 AD3d 1528, 1534 [2018]). We have reviewed the record and, in light of the financial circumstances of the parties, the award of maintenance and child support to the wife, despite the parties sharing equally in parenting time, and the equitable distribution of the property, we do not find that the court abused its discretion in denying the wife's prejudgment motion for counsel fees (see e.g. Bell-Vesely v Vesely, 180 AD3d at 1276; Seale v Seale, 154 AD3d at 1197). We reach this same conclusion as to the court's award of $5,000 in counsel fees to the wife for the postjudgment proceedings, which Supreme Court found to be reasonable after a thorough examination into the other relevant factors regarding financial circumstances. Lastly, the husband's argument that Supreme Court improperly awarded the wife 50% of the pretax value of a distribution of ordinary income to the husband from his prior law firm is unpreserved as the husband made no such argument before Supreme Court (see Kimberly C. v Christopher C., 155 AD3d 1329, 1331 [2017]). Any remaining contentions that have not been specifically addressed herein have been examined and found to be lacking in merit.
Garry, P.J., Egan Jr., Aarons and Colangelo, JJ., concur.
ORDERED that the amended judgment and the December 18, 2019 order are modified, on the law, without costs, by reversing so much thereof as (1) awarded child support, (2) denied defendant's request to be removed from the mortgage, and (3) awarded plaintiff a $25,000 credit to repay plaintiff's mother; defendant shall pay plaintiff monthly child support in the amount of $2,356 plus 69% of all unpaid health care, medical and special education costs and plaintiff shall defend, indemnify and hold defendant harmless from any and all payments due under the mortgage; and, as so modified, affirmed.
ORDERED that the order entered September 19, 2019 and the amended order entered February 4, 2020 are affirmed, without costs.



Footnotes

Footnote 1: In the May 15, 2019 amended judgment, Supreme Court awarded the wife monthly maintenance in the amount of $2,237.50. This award was reduced to $1,963.92 monthly in the December 18, 2019 order.

Footnote 2: In the May 15, 2019 amended judgment, Supreme Court set the duration of maintenance as 4.2 years. The duration was reduced to 3 years and 10 months in the December 18, 2019 order.

Footnote 3: To the extent that the husband is asserting that Supreme Court should have imputed income to the wife based upon her earnings at her prior job, we are unpersuaded. As discussed supra, both parties substantially reduced their income to be able to spend more time with their children. As determined by the court, neither party "reduced resources or income in order to reduce or avoid the [parties'] obligation for [maintenance]" (Lattuca v Lattuca, 129 AD3d 1683, 1684 [2015] [internal quotation marks and citation omitted], lv dismissed 26 NY3d 1095 [2016], lv denied 28 NY3d 1099 [2016]). Thus, the court did not err in declining to impute income based upon the wife's prior earnings.

Footnote 4: Although the husband states that neither party addressed the new legislation because the court "expressly indicated" that the divorce would be completed before the new legislation took effect, the record belies this argument. This passing comment was made at the end of trial, thus it cannot be said that the husband relied upon this comment in failing to present any evidence regarding the new legislation. Moreover, Supreme Court's comment that the parties would "have [their] answer in [2½] months" cannot be construed as a promise that the divorce would be completed by the end of the year, especially given that the parties' posttrial briefs were not to be submitted until November 30, 2017 at the earliest.

Footnote 5: Beyond arguing that Supreme Court should have imputed more income to the wife, which argument this Court has found to be without merit, the husband does not argue on appeal that any of these calculations are erroneous.

Footnote 6: Indeed, in the affirmation in opposition to the husband's motion to renew and reargue seeking removal from the note and mortgage, the wife stated that "she agreed to assume full responsibility for future payments on the note and mortgage."