22-557-cv
*Najah Edmundson v. Klarna Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term 2022

(Argued:  April 10, 2023     Decided: November 3, 2023)

Docket No. 22-557-cv

———————————

NAJAH EDMUNDSON, individually and
on behalf of all others similarly situated,

*Plaintiff-Appellee,*

*v.*

KLARNA, INC.,

*Defendant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

———————————

Before:     LEVAL, CHIN, AND SULLIVAN, *Circuit Judges*.

———————————

Appeal from an order of the United States District Court for the District of Connecticut (Nagala, *J.*), entered February 15, 2022, denying defendant-appellant's motion to compel arbitration. In this putative consumer class action, plaintiff-appellee brings claims for common-law fraud and violations of the Connecticut Unfair Trade Practices Act against defendant-appellant, a company offering "buy now, pay later" financial services. Defendant-appellant moved in the district court to compel arbitration, contending that the consumer agreed to a mandatory arbitration provision in the company's terms on three occasions when she utilized defendant-appellant's online services. The district court denied defendant-appellant's motion to compel arbitration and stayed the underlying action pending this appeal.

REVERSED AND REMANDED.

LINNET DAVIS-STERMITZ (Matthew W.H. Wessler, *on the brief*), Gupta Wessler PLLC, Washington, DC, and Sophia Goren Gold, KalielGold, Berkeley, CA, *for Plaintiff-Appellee.*

ANTON METLITSKY (Leah Godesky and Kendall Turner, *on the brief*), O'Melveny & Myers LLP, New York, NY and Washington, DC, *for Defendant-Appellant.*

CHIN, *Circuit Judge*:

Defendant-appellant Klarna, Inc. ("Klarna") provides a "buy now, pay later" service that allows shoppers to buy a product and pay for it in four equal installments over time without incurring any interest or fees. App'x at 10-11. In 2021, plaintiff-appellee Najah Edmundson paid for two online purchases using Klarna. Shortly thereafter, Klarna automatically deducted partial repayments for these purchases from Edmundson's checking account. Because her account lacked sufficient funds to cover Klarna's deductions, Edmundson incurred $70 in overdraft fees -- which were assessed not by Klarna, but by the financial institution associated with her bank account.

Edmundson brought this action on behalf of herself and a class of similarly situated consumers, alleging that Klarna misrepresents and conceals the risk of bank-overdraft fees that consumers face when using its pay-over-time service and asserting claims for common-law fraud and violations of the Connecticut Unfair Trade Practice Act ("CUTPA"). Klarna moved to compel arbitration on the grounds that Edmundson was presented with and assented to its Services Terms, which include a mandatory arbitration provision, when she (1) selected Klarna as her payment method for an online purchase; (2) used a

3

Klarna checkout "widget" to finalize this purchase; and (3) created an account

and logged into Klarna's software application for smartphones (the "Klarna

App").  The district court (Nagala, *J.*) denied Klarna's motion, concluding that at

no point did Edmundson have reasonably conspicuous notice of and

unambiguously manifest assent to Klarna's terms.  *See Edmundson v. Klarna, Inc.*,

642 F. Supp. 3d 256, 260 (D. Conn. 2022).  The district court held that Edmundson

therefore was not bound by the mandatory arbitration provision contained in

Klarna's terms.  *Id.* at 274.

For the reasons set forth below, we REVERSE the district court's

order and REMAND with instructions to grant Klarna's motion to compel

arbitration.

*STATEMENT OF THE CASE*

## I.     The Facts

The facts are undisputed and are summarized as follows:

Klarna is one of the largest "buy now, pay later" services, reaching 90

million active customers across 17 countries.  Klarna offers "point-of-sale loans

for online and in-store purchases" that allow shoppers to purchase products in

four installments without incurring any interest or fees.  When making a

4

purchase from a merchant that offers Klarna's services, customers are asked at checkout whether they would rather use a traditional upfront payment method or Klarna's "Pay in 4" service. If the customer chooses to use Klarna, the customer provides her name, address, date of birth, and debit card information to Klarna, either through its checkout widget on a merchant's website or through the Klarna App. Klarna then divides the total purchase price into four equal installments. The first installment is charged to the customer at checkout. The remaining three payments are automatically deducted from the customer's checking account every two weeks until the balance is paid in full.

Edmundson is a former Klarna customer who resides in Connecticut. In support of its motion to compel arbitration, Klarna submitted a declaration from Senior Product Manager Erin Riffe, in which Riffe represented that Klarna maintains records of each customer's transaction history, and identified from those records the dates and methods by which Edmundson made purchases using Klarna and logged into the Klarna App. Attached to the declaration were screenshots of the three interfaces that Edmundson would have seen when she first used Klarna to make a purchase and when she first logged into the Klarna App.

On or about December 23, 2020, Edmundson arrived at the first interface (hereinafter, the "Pay-with-Klarna Screen") when she was choosing from six payment methods to make an online purchase on GameStop's website. *See* Addendum A. Because GameStop is one of Klarna's merchant partners, all consumers shopping on GameStop's website are offered the option of paying with Klarna during the online checkout process. Once Edmundson selected to pay with Klarna from a list of payment methods entitled "BUY NOW PAY LATER," the interface displayed a schedule of four interest-free payments in the amount of approximately $81 each. App'x at 23. Under the schedule, in a smaller gray font were the words: "By continuing, I accept Klarna Services terms, Privacy Policy, Pay Later in 4 terms and request electronic communication." *Id.* These underlined phrases -- which were also bolded and in black font on a white background -- were hyperlinks that, when clicked, displayed the then-current versions of Klarna's Services Terms, Privacy Policy, and "Pay Later in 4 Agreement," respectively. To continue purchasing the GameStop item with Klarna, Edmundson selected the button marked "Pay with Klarna." Addendum A.

6

Edmundson was thereafter prompted to enter her debit card information. *See* Addendum B. After she clicked the button marked "Continue," Edmundson arrived at the second interface (hereinafter, the "Klarna Widget"), where she was to finalize her purchase from GameStop. *See* Addendum C. From top to bottom, the Klarna Widget instructed the user to "Review your plan" and listed details about the "Payment plan," including the amount of the four equal payments, the amount "Due today," and the total cost of the transaction. The Widget then set forth the statement "I agree to the payment terms" and provided a button marked "Confirm and continue." *Id.* The phrase "payment terms" was underlined, bolded, and served as a hyperlink, which, when clicked, would display the same "Pay Later in 4 Agreement" that was hyperlinked on the Pay-with-Klarna Screen. Until the purchaser clicked on "Confirm and continue," she was "free to exit the Klarna widget at any time . . . without incurring any fee or penalty." App'x at 24. When Edmundson clicked on "Confirm and continue," she completed her purchase of the GameStop product. Addendum C.

On or about December 27, 2020, Edmundson interacted with the third interface (hereinafter, the "App Login Screen") when she downloaded and used the Klarna App for the first time. *See* Addendum D. This interface

7

presented Edmundson with the options to "Sign up," "Log in," or "Pay in-store." *Id.* Below those options, in white text on a black background were two disclaimers: (1) "Message and data rates may apply"; and (2) "By clicking 'Sign in' I approve Klarna's User Terms and confirm that I have read Klarna's Privacy Notice. Links in the app are sponsored." *Id.* The phrase "Klarna's User Terms" was a hyperlink that, if selected, displayed the same Services Terms that were hyperlinked on the Pay-with-Klarna Screen. To continue into the Klarna App from this interface, Edmundson had to select "Sign up," "even though she had already created an account with Klarna . . . in connection with her December 23, 2020 [GameStop] purchase." App'x at 25. For each subsequent use of the Klarna App, Edmundson selected "Log in" on the App Login Screen.

Edmundson interacted with these three interfaces on subsequent occasions. On January 22, 2021, when completing another purchase on GameStop's website using Klarna, Edmundson again viewed the contents of the Pay-with-Klarna Screen and the Klarna Widget. And from February 4 through April 22, 2021, Edmundson viewed the App Login Screen before initiating several transactions in the Klarna App.

8

At all times that Edmundson used Klarna's "Pay in 4" service, Klarna's Services Terms included the following mandatory arbitration provision and prohibition on representative litigation:

> You agree that any and all disputes or claims, including without limitation federal and state regulatory and statutory claims, common law claims, and those based in contract, tort, fraud, misrepresentation or any other legal theory, arising out of or relating to these Terms or the relationship between you and Klarna . . . shall be resolved exclusively through final and binding arbitration . . . rather than in court . . . .
>
> . . . .
>
> YOU AGREE THAT EACH PARTY MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION[.]

App'x at 49-50. This provision was also incorporated by reference in Klarna's "Pay Later in 4 Agreement," which provided that users were, *inter alia*, subject to the "Mandatory Arbitration of Disputes" and included a hyperlink to the arbitration provision in Klarna's Services Terms. *Id.* at 28.

According to Klarna's records, Edmundson timely satisfied all her installment payments and Klarna never charged Edmundson any interest or fees. But Edmundson incurred other fees in connection with her use of Klarna's "Pay

in 4" service. On March 6 and March 7, 2021, Klarna deducted $15.83 and $9.31 from Edmundson's checking account at Nutmeg State Financial Credit Union as partial repayments for Edmundson's earlier purchases with Klarna. But because Edmundson lacked sufficient funds in her checking account to satisfy these deductions, Nutmeg State Financial Credit Union assessed her two overdraft fees, amounting to a total of $70.

## II.     The District Court Proceedings

On June 6, 2021, Edmundson brought this putative class action against Klarna, seeking to represent a class of all persons who used Klarna's "Pay in 4" service and incurred an overdraft fee from a third-party financial institution "as a result of a Klarna repayment deduction." *Id.* at 14. The complaint asserts claims for common-law fraud and violations of CUTPA. Specifically, Edmundson alleges that Klarna "targets poor consumers and those struggling to make ends meet" by falsely representing that its "Pay in 4" service is completely free, with "[n]o interest" or "catch[es]," and failing to disclose that the users may incur steep overdraft fees imposed by their own banks if their bank accounts lack sufficient funds to cover the amount owed to Klarna. App'x at 8, 11. Edmundson alleges that she "had no idea small, automatic Klarna repayments

10

could cause $35 bank fees," and that she would not have used Klarna "if she had been adequately informed of the risks of bank fees." *Id.* at 13-14.

On August 16, 2021, Klarna moved to compel arbitration, arguing that when Edmundson viewed each of the three interfaces discussed above, she was presented with Klarna's Services Terms, including the mandatory arbitration provision, and was instructed that continuing with the transaction would constitute acceptance of those terms. Each time, according to Klarna, Edmundson unambiguously manifested assent by choosing to transact with Klarna. The district court denied the motion, analyzing all three interfaces and concluding that none provided reasonably conspicuous notice of Klarna's terms and that none supported the inference that Edmundson unambiguously manifested assent to those terms. *See Edmundson*, 642 F. Supp. 3d at 267-74.

First, as to the Pay-with-Klarna Screen, the district court held that notice of Klarna's terms was insufficiently conspicuous given the "clutter on the screen." *Id.* at 268. The district court further held there was no manifestation of assent to any terms at this point in the transaction because a reasonable user could select "Pay with Klarna" and then choose, without consequence, to use another payment method (or ditch the transaction altogether). *Id.* at 269.

11

As to the Klarna Widget and the App Login Screen, the district court also concluded that these interfaces could not support an inference of Edmundson's unambiguous assent to Klarna's terms. Because the Klarna Widget simply stated "I agree to the payment terms," without indicating what action would be sufficient to manifest such agreement, the district court held that "[t]here is nothing anywhere on the screen that would alert a reasonable user to the fact that clicking 'confirm and continue' has any contractual significance at all, much less acceptance of a contract that includes an arbitration agreement." *Id.* at 271. Similarly, because the App Login Screen instructed that a user assents to Klarna's terms by clicking "Sign in" but only provided options for the user to "Sign up" or "Log in," the district court held that a reasonable user could have believed "that since she was not clicking a button labeled 'sign in,' she was not bound" to any terms. *Id.* at 273-74. Finally, the district court rejected Klarna's argument that the repeated references and hyperlinks to its terms across the three interfaces provided inquiry notice, recognizing that each interface used different labeling conventions, and therefore "it [was] likely that a reasonable user would understand each of these links to lead to a different agreement." *Id.* at 274.

12

Klarna timely appealed the district court's February 15, 2022 order denying the motion to compel arbitration pursuant to 9 U.S.C. § 16, which permits interlocutory appeals from the denial of a motion to compel arbitration. On March 18, 2022, Klarna moved to stay all district court proceedings pending resolution of its appeal. The district court granted that motion on May 6, 2022, and stayed the underlying action, recognizing, *inter alia*, "that there are serious questions going to the merits of [Klarna's] appeal" and that Klarna's "motion to compel arbitration presented a close question." App'x at 101.

## DISCUSSION

### I.     Applicable Law

#### A.     *Standard of Review*

We review *de novo* a district court's denial of a motion to compel arbitration. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002). The determination of whether parties have contractually bound themselves to arbitrate a dispute is likewise subject to *de novo* review, but the factual findings upon which that legal determination is based are reviewed for clear error. *Id.*[1]

---

[1]     "Although determinations regarding mutual assent and reasonable notice usually involve questions of fact," when, as here, "the facts . . . are undisputed, and the district court determined as a matter of law that no reasonable factfinder could have

In deciding motions to compel, courts apply a "standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). We must "consider all relevant, admissible evidence submitted by the parties and . . . draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

## B.    *Arbitrability*

The Federal Arbitration Act (the "Act") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Act also requires federal courts, upon application of a party to the contract, to stay adjudication of claims covered by an enforceable arbitration agreement until such arbitration has been had. *See id.* § 3. It is well-established that these statutory provisions reflect both a "liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted). Accordingly,

---

found that the notice was reasonably conspicuous and the assent unambiguous," we review these conclusions from the district court *de novo*. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017).

14

while the Act "place[s] arbitration agreements on an equal footing with other contracts," *id.*, it "is not a substitute for contractual assent, and we will not enforce arbitration unless and until it is determined that an agreement [to arbitrate] exists," *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 834 (2d Cir. 2021).

Whether the parties have agreed to arbitrate is generally a question of state contract law. *See Specht*, 306 F.3d at 27. The district court applied Connecticut law on the question of contract formation, *see Edmundson*, 642 F. Supp. 3d at 265-66, and the parties do not challenge that decision on appeal. Nonetheless, as the parties acknowledge, traditional contract formation law does not vary meaningfully from state to state, Appellant's Br. at 22 n.2; Appellee's Br. at 25 n.8, and therefore, our precedents determining the enforceability of arbitration provisions according to the contract-law principles of other states may also be relevant to this dispute. *See, e.g.*, *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) (noting that "Connecticut and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term."); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (noting the same about New York and California). Accordingly, we need

15

not and do not limit ourselves to Connecticut law in resolving this question of arbitrability.[2]

## C. Formation of Web-Based Contracts

To form a contract, there must be "a manifestation of mutual assent to the exchange between two or more parties" made by written or spoken word, or by conduct. *Ubysz v. DiPietro*, 440 A.2d 830, 833-34 (Conn. 1981). These principles are the "touchstone of contract" formation, *Specht*, 306 F.3d at 29, and they apply with equal force to contracts formed online, *see Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.").

We have, nonetheless, recognized that an offeree's manifestation of assent to an offeror's terms looks different for consumer contracts formed online, in which terms are usually unnegotiated and consumers often proceed without reading the fine print. *See Meyer*, 868 F.3d at 75-76 (discussing how a user manifests assent to different types of web-based contracts, including "clickwrap,"

---

[2]	At the same time, we recognize that contract formation through the internet is a subject of recent development. It would not be surprising if the courts of different states developed differing approaches and arrived at different conclusions to questions regarding the formation of web-based contracts.

16

"browsewrap," and "sign-in-wrap" agreements); *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) ("[C]ourts confronted with online agreements such as those at issue here have devised rules to determine whether meaningful assent has been given."). Courts have ruled that, where there is no evidence that an internet or app user had actual knowledge of the contractual terms, the user will still be bound if (1) a "'reasonably prudent' person would be on *inquiry* notice" of the terms, *Soliman*, 999 F.3d at 834 (quoting *Meyer*, 868 F.3d at 74-75), and (2) the user unambiguously manifests assent "through . . . conduct that a reasonable person would understand to constitute assent," *Schnabel*, 697 F.3d at 120; *see also Specht*, 306 F.3d at 35 ("Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility."). Both inquiries, therefore, are generally measured by an "objective standard," *Specht*, 306 F.3d at 30, and are "clearly. . . fact-intensive," *Meyer*, 868 F.3d at 76.

Who is the "reasonably prudent" internet or smartphone user? The standard does not require us to imagine a user who has "never before encountered" a smartphone app or entered into an online contract. *Meyer*, 868

17

F.3d at 77. Nor are we to consider the perspective of a highly savvy and sophisticated user, someone who spends all waking hours using some kind of technology. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 380 (E.D.N.Y. 2015) (referring to the "average internet user" as "one who does not necessarily conduct much of her business online"). Courts have viewed the reasonably prudent user as somewhere in between; such a user is not a complete stranger to computers or smartphones, having some familiarity with how to navigate to a website or download an app. *See, e.g., Meyer*, 868 F.3d at 77-78 ("[A] reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found."); *see also Selden v. Airbnb, Inc.*, 2016 WL 6476934, at *5 (D.D.C. Nov. 1, 2016) ("The act of contracting for consumer services online is now commonplace in the American economy."), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021); *Small Just. LLC v. Xcentric Ventures LLC*, 99 F. Supp. 3d 190, 197 (D. Mass. 2015) (noting that a "reasonably prudent internet user . . . is conversant in the basic navigation tools required to effectively utilize a website" and therefore, would be familiar with a "scroll bar"), *aff'd*, 873 F.3d 313 (1st Cir. 2017).

18

A reasonably prudent internet or smartphone user is on inquiry notice of contractual terms where the terms are presented in a clear and conspicuous way. *See Specht*, 306 F.3d at 30 ("Clarity and conspicuousness of arbitration terms are important in securing informed assent."). "In the context of web-based contracts, we look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in [a] way that would put her on inquiry notice of such terms." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). For example, "when terms are linked in obscure sections of a webpage that users are unlikely to see, courts will refuse to find constructive notice." *Nicosia*, 834 F.3d at 233 (collecting cases). By contrast, when terms are linked on an "uncluttered" interface and temporally and "spatially coupled with the mechanism for manifesting assent," and the user does not need to scroll beyond what is immediately visible to find the terms, we have concluded, as a matter of law, that the interface provided reasonably conspicuous notice of the existence of contractual terms. *Meyer*, 868 F.3d at 78-79 ("That the Terms of Service were available only by hyperlink does not preclude a determination of reasonable notice. . . . As long as the hyperlinked text was itself

19

reasonably conspicuous . . . a reasonably prudent smartphone user would have constructive notice of the terms.").

As for the second requirement -- the unambiguous manifestation of assent -- we have held that "acceptance need not be express, but where it is not, there must be evidence that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound." *Schnabel*, 697 F.3d at 128. In other words, where an internet or smartphone user does not explicitly say "I agree" to the contractual terms, a court must determine whether a reasonably prudent user would understand his or her conduct to constitute assent to those terms. *Id.* at 120. In making this determination in the context of web-based contracts, we have considered (1) whether the interface clearly warned the user that taking a specific action would constitute assent to certain terms, *see Meyer*, 868 F.3d at 80 ("[T]he text on the [interface] not only included a hyperlink to the Terms of Service, but expressly warned the user that by creating an . . . account, the user was agreeing to be bound by the linked terms."); (2) whether notice of the contractual terms was presented to the consumer in a location on the interface and at time when the consumer would expect to receive such terms, *see Nicosia*, 834 F.3d at 236

(finding no "manifest[ation] [of] assent to [] additional terms" where "the presentation of terms [was] not directly adjacent to the . . . button so as to indicate that a user should construe clicking as acceptance"); *Schnabel*, 697 F.3d at 127 ("[T]he presentation of these terms at a place and time that the consumer will associate with the initial . . . enrollment, or the use of . . . [the] services from which the recipient benefits at least indicates to the consumer that he or she is . . . employing such services subject to additional terms and conditions that may one day affect him or her."); and (3) the "course of dealing between the parties," *Schnabel*, 697 F.3d at 124, including whether the contract terms were conspicuously presented to the consumer at each use of the offeror's service and the consumer's conduct in response to the repeated presentation of conspicuous terms, *see Starke*, 913 F.3d at 296 (noting that although the consumer transacted with the offeror "on six prior occasions," he was never given "clear and conspicuous notice that the transaction would subject him to binding arbitration," and therefore, did not manifest assent); *Register.com*, 356 F.3d at 401 (finding assent to contract terms in part because consumer's use of service was not "sporadic and infrequent," but daily, and consumer received notice of terms with each use).

## II.    Analysis

There is no dispute that Klarna's terms include a mandatory arbitration provision, and that Edmundson's claims fall within the scope of that provision.  Indeed, Edmundson concedes that if the arbitration provision is deemed enforceable as to her, she would be prohibited from adjudicating her claims against Klarna before the district court.  Therefore, the only issues on appeal are whether (1) notice of Klarna's terms (and thus the arbitration provision contained therein) was reasonably clear and conspicuous such that a reasonable internet or smartphone user would be on inquiry notice of them, and (2) Edmundson objectively and unambiguously manifested assent to the terms. Because we conclude that Edmundson's interaction with the Klarna Widget satisfied these requirements, we conclude, as a matter of law and pursuant to this Court's precedents, that Edmundson agreed to arbitrate her claims against Klarna.[3]

---

[3]    We do not address whether the Pay-with-Klarna Screen or the App Login Screen provided inquiry notice of Klarna's terms.  Because we find that the Klarna Widget provided Edmundson with inquiry notice, we need not engage further with the Pay-with-Klarna Screen or the App Login Screen.

22

### A.  *Reasonably Conspicuous Notice*

Several factors weigh in favor of finding that the Klarna Widget provided "reasonably conspicuous notice" of Klarna's terms.  *Specht*, 306 F.3d at 32.

To start, the Klarna Widget interface is "uncluttered" and bears close resemblance to the interface we endorsed in *Meyer*, which presented the user with fields with which to enter credit card details, one link to the terms at issue, and three buttons to select either to register for a new account or to connect to two types of pre-existing accounts.  *Meyer*, 868 F.3d at 78, 82 (Addendum B).  On the Klarna Widget, the only link provided is to Klarna's terms, and the user is presented with only one button to click -- that is, selecting "Confirm and continue."  *See* Addendum C.  This content is "visible at once, and the user does not need to scroll beyond what is immediately visible to find notice" of Klarna's terms.  *Meyer*, 868 F.3d at 78; *cf. Specht*, 306 F.3d at 23, 31-32 (holding that a reasonably prudent user would not have known of terms that were visible only if user "happen[ed] to scroll down" to the bottom of webpage).

Given the relative lack of clutter on the Klarna Widget, this interface differs sharply from those in prior cases that we deemed insufficient, as a matter

23

of law, to provide inquiry notice.  For example, in *Soliman*, we held that an arbitration provision would not have been conspicuous to a reasonably prudent consumer in part because notice of the terms "was buried within a fine-print paragraph with over eighty other words [and] was not set off in any way within that paragraph (by color, emphasis, etc.)."  999 F.3d at 835.  In *Nicosia*, we held that "reasonable minds could disagree on the reasonableness of notice" where the interface in question contained "between fifteen and twenty-five links," "various text . . . in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements," and "the customers' personal address, credit card information, shipping options, and purchase summary."  834 F.3d at 237-38, 241 (Addendum B).  And finally, the overall clutter of the interface in *Starke* led us to conclude that it was "[l]ike the interface in *Nicosia*, and in sharp contrast with the screen in *Meyer*," and we similarly held there was no reasonably conspicuous notice of the terms at issue. *Starke*, 913 F.3d at 293.

Although the hyperlinks to Klarna's terms are in a smaller font relative to other text on the Klarna Widget, they are set apart from surrounding information by being underlined and in a color that stands in sharp contrast to

the color of the interfaces' backgrounds. *See* Addendum C (black text on white background). And because the interface does not include a plethora of clutter or extraneous information, the notice to Klarna's terms -- even if in a smaller font -- appears sufficiently "conspicuous in light of the whole [interface]." *Nicosia*, 834 F.3d at 237.

Moreover, as in *Meyer*, the hyperlink to Klarna's terms on the Klarna Widget is spatially and temporally coupled with the user's transaction with Klarna. *See* 868 F.3d at 78; *cf. Starke*, 913 F.3d at 294 (holding that terms of service were not spatially or temporally coupled when provided only after user's purchase of service). Spatially, the hyperlink to Klarna's terms appears directly adjacent to the "button intended to manifest assent to the terms." *Meyer*, 868 F.3d at 78. The statement "I agree to the payment terms" is directly above the "Confirm and continue" button, which a user must click to complete the purchase using Klarna. App'x at 24. *See* Addendum C. A reasonable internet user, therefore, could not avoid noticing the hyperlink to Klarna's terms when the user selects "Confirm and continue" on the Klarna Widget.

Temporally, a reasonably prudent internet or smartphone user would expect terms of service to be presented when the user has navigated to the

Klarna Widget. We have held that "the presentation of these terms at

. . . purchase or enrollment . . . indicates to the consumer that he or she is taking

such goods or employing such services subject to additional terms and

conditions that may one day affect him or her." *Schnabel*, 697 F.3d at 127. Here,

users only arrive at the Klarna Widget when they are about to finalize a purchase

using Klarna's "Pay in 4" service. *See* Addendum C. Accordingly, at this instance

of purchase -- when the user is about to receive a benefit from Klarna -- a

reasonably prudent user would understand that the terms presented on the

interface govern the user's future relationship with Klarna.

Finally, the interface includes language signaling to users that they

will be agreeing to Klarna's terms through their conduct. As discussed, included

on the Klarna Widget is the statement "I agree to the <u>payment terms</u>."

Addendum C. This language is more akin to the warning provided in *Meyer*

than to the vague references to "terms and conditions" used in other cases, which

we deemed to undermine the conspicuousness of notice. *Compare Meyer*, 868

F.3d at 78 ("By creating an Uber account, you agree to the TERMS OF SERVICE &

PRIVACY POLICY."), *with Soliman*, 999 F.3d at 832 ("Terms and conditions at

subway.com/subwayroot/ TermsOfUse.aspx"), *and Starke*, 913 F.3d at 294 ("Terms

26

& Conditions").  Moreover, we look at the "totality of the circumstances" to determine whether notice was reasonably conspicuous, *Soliman*, 999 F.3d at 831, and therefore, the "particular language used in relation to the hyperlinked or otherwise-referenced terms and conditions," *id.* at 837, is just one factor to consider.  Here, in light of the totality of the circumstances -- the overall lack of clutter on the Klarna Widget, the conspicuousness of the notice of Klarna's terms in relation to the interface as a whole, the spatial and temporal proximity of the terms to the mechanisms for manifesting assent, the obvious fact that there would be a continuing relationship involving the payment of installments over time, and the language advising users that they are agreeing to Klarna's terms -- we conclude that a reasonably prudent internet or smartphone user would have been on notice that the hyperlinked terms were connected to finalizing a purchase on the Klarna Widget.

To be sure, the Klarna Widget has some deficiencies.  For example, it could be argued that blue font is a better signal to consumers that text contains a hyperlink.  *Meyer*, 868 F.3d at 77–78.  But, as we have previously emphasized, there are "no particular features that must be present to satisfy the reasonably conspicuous standard," *Soliman*, 999 F.3d at 842, "there are infinite ways to design

27

a website or smartphone application," *Meyer*, 868 F.3d at 75, and "the format used in *Meyer* is [not] the only effective way to" form an online contract, *Starke*, 913 F.3d at 296-97.  And most importantly, none of these deficiencies are fatal to our finding that, under the totality of the circumstances, the Klarna Widget provided, as a matter of law, reasonably conspicuous notice of Klarna's terms, including the mandatory arbitration provision.

### B.       *Unambiguous Manifestation of Assent*

Although Edmundson's assent to arbitration was not express, we conclude that Edmundson unambiguously manifested assent "through . . . conduct that a reasonable person would understand to constitute assent." *Schnabel*, 697 F.3d at 120.  Edmundson unambiguously manifested assent to Klarna's terms when, on December 23, 2020, she selected "Confirm and continue" to finalize her GameStop purchase using Klarna's "Pay in 4" service.  App'x at 23.

Reasonable internet users would understand that selecting "Confirm and continue" on the Klarna Widget constitutes their confirmation that they "agree to the <u>payment terms</u>" and continues the user's transaction using Klarna's "Pay in 4" Service.  As described above, a reasonable user could not avoid the notice of Klarna's terms, which were hyperlinked in the statement, "I agree to the

28

payment terms." Indeed, this statement was placed directly above the "Confirm and continue" button, the interface was, as a whole, uncluttered, and the terms were presented at a time when a reasonable user would expect to receive them. *See* Addendum C. Aside from the "Confirm and continue" button, the only other selections a user could make on the Klarna Widget were to "change" the debit card associated with the purchase, or to exit the purchase altogether, neither of which objectively constitute assent to Klarna's "payment terms." But selecting "Confirm and continue" clearly does constitute such assent.

In these circumstances, it would be unreasonable for an internet user to read the conspicuous and clear statement, "I agree to the payment terms," with the button marked "Confirm and continue" directly below it, and not understand that the "Confirm and continue" button is the mechanism by which the user "[c]onfirm[s]" his or her "agree[ment] to the payment terms" and "continue[s]" the transaction with Klarna. *See id.*; *see also Meyer*, 868 F.3d at 80 ("The fact that clicking the register button had two functions -- creation of a user account and assent to the Terms of Service -- does not render [the user's] assent ambiguous.").

"The transactional context of the parties' dealings reinforces [this] conclusion." *Meyer*, 868 F.3d at 80. Edmundson navigated to the Klarna Widget

29

only after (1) selecting Klarna from a list of six payment methods to purchase an item from the GameStop website, *see* Addendum A, and (2) entering her debit card information with the intention of receiving the benefits of Klarna's "Pay in 4" service, *see* Addendum B.  When Edmundson arrived at the Klarna Widget, she knew well that purchasing the GameStop item with Klarna meant that she was entering into a continuing relationship with Klarna, one that would endure at least until she repaid all four installments.  The Klarna Widget provided clear notice that there were terms that would govern this continuing relationship.  A reasonable internet user, therefore, would understand that finalizing the GameStop transaction, entering into a forward-looking relationship with Klarna, and receiving the benefit of Klarna's service would constitute assent to those terms.

  We recognize that some of Edmundson's arguments are not unreasonable.  To be sure, Klarna could have chosen to include clearer instructions, such as "By selecting 'Confirm and continue,' I agree to the terms set forth under this hyperlink:  payments terms."  Moreover, the Klarna Widget's statement "I agree to the payment terms" appears just below a specification of what may reasonably be considered payment terms -- including the specification

30

that there would be four payments of equal specified amount, the amount of the payment that was "due today," and the total cost of the purchase. Addendum C.

Nonetheless, upon full consideration of Edmundson's arguments, we are not convinced. Contrary to Edmundson's assertion, we have never held that "a company must 'explicitly advise[]' the user 'that the act of clicking will constitute assent to [its] terms and conditions.'" Appellee's Br. at 55 (quoting *Berman*, 30 F.4th at 857). Rather, we have only required that the interface "make clear" to the reasonable internet user that a specific "click" signifies assent. *See Specht*, 306 F.3d at 29-30 ("[A] consumer's clicking on a download button does not communicate assent to contractual terms if the offer *did not make clear* to the consumer that clicking on the download button would signify assent to those terms[.]" (emphasis added)); *Schnabel*, 697 F.3d at 128 ("[T]here must be evidence that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound."). The Klarna Widget satisfies this burden.

Furthermore, Edmundson could not have reasonably believed that the information set forth on the Klarna Widget above the hyperlinked "payment terms" represented *all* the terms governing her use of Klarna's service. The

Klarna Widget set forth *some* "payment terms," but it did not mention, for example, when future payments would be due, how payments would be collected, and what would be the consequences for failing to make timely payments. Accordingly, Edmundson was on inquiry notice that her "agree[ment] to the payment terms," Addendum C, necessarily encompassed more than the information provided on the Klarna Widget, and the burden was then on her to find out to what terms she was accepting, *see Meyer*, 868 F.3d at 77-78.

Accordingly, we conclude on the undisputed facts of this case that Edmundson unambiguously manifested her assent to Klarna's terms, and hold, as a matter of law, that Edmundson agreed to arbitrate her claims against Klarna.

## CONCLUSION

For the reasons set forth above, the order of the district court is REVERSED, and the case is REMANDED with instructions to grant Klarna's motion to compel arbitration.

# ATTACHMENTS

## Addendum A (App'x at 36)



**Addendum B (App'x at 61)**



**Addendum C (App'x at 62)**



34

# Addendum D (App'x at 64)

