Wu v Uber Tech., Inc. (2024 NY Slip Op 05869)

Wu v Uber Tech., Inc.

2024 NY Slip Op 05869

Decided on November 25, 2024

Court of Appeals

Cannataro

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 25, 2024

No. 90

[*1]Emily Wu, Appellant,
v
Uber Technologies, Inc., Respondent, et al., Defendants.

Joshua D. Kelner, for appellant.
Michael R. Huston, for respondent.
Chamber of Commerce of the United States of America et al., Public Justice, amici curiae.

CANNATARO, J.

On this appeal, we apply centuries-old principles of contract law to a web-based "terms of use" update containing an arbitration agreement. The parties dispute the validity of that agreement and its applicability to this personal injury action, which plaintiff commenced two months before she indicated her assent to the updated terms of use by means of a series of clicks on her smartphone. 
We conclude that the "clickwrap" process Uber used to solicit plaintiff's assent resulted in the formation of an agreement to arbitrate. Moreover, a key term of that agreement expressly delegates to an arbitrator the exclusive authority to resolve all disputes as to the applicability and enforceability of the agreement. Because plaintiff has not established that the delegation provision is invalid, her challenges to the portions of the agreement that purportedly apply to pending legal claims were properly directed to the arbitrator.
I.
In July 2020, plaintiff Emily Wu requested a car using Uber's software application on her smartphone. An Uber-affiliated driver took her to an intersection in Brooklyn where, according to the complaint, the driver discharged plaintiff in the middle of the roadway. Upon exiting the car, plaintiff was almost immediately struck by another vehicle, sustaining injuries.
Plaintiff commenced this personal injury action in November 2020. As relevant here, the complaint pleads a negligence claim against Uber on a respondeat superior theory. On November 23, 2020, plaintiff served her complaint on Uber by personal service upon the New York Secretary of State (see Business Corporation Law § 306 [b]). As explained further below, Uber acknowledges [*2]that this service was legally effective but disputes that it became aware of the lawsuit at that time, claiming that its New York City office was not fully processing mail in late 2020 due to the COVID-19 pandemic. Consistent with that assertion, Uber did not respond to the complaint or appear in this action within 30 days as required by law (see CPLR 3012 [c]).
In January 2021, almost two months after plaintiff's service of process through the Secretary of State, but before plaintiff served Uber with a motion for a default judgment (see CPLR 3215), non-attorney employees of Uber circulated an email "on a mass basis" to millions of the company's U.S. users informing them that, in the upcoming days, they would be prompted to agree to updated terms of use in order to continue using the ride-sharing service. In relevant part, the three-paragraph email to Uber users stated:
"We recommend that you review the updated Terms. Some of the updates include changes to the Arbitration Agreement, the terms related to access and use of the Uber platform, and procedures and rules for filing a dispute against Uber."
The updated terms were available for recipients' review by clicking on any of three hyperlinks appearing in the email. It is undisputed that plaintiff received and opened this email on January 15, 2021.
The next time plaintiff logged into the Uber app on her smartphone, she was presented with an in-app blocking pop-up screen with the headline, "We've updated our terms." The uncluttered screen encouraged plaintiff to review the new terms of use and included a hyperlink to those terms indicated by underlined and blue text. Toward the bottom of the screen was a checkbox and, to its immediate right, bolded text stating: "By checking the box, I have reviewed and agreed to the Terms of Use and acknowledge the Privacy Notice." Immediately beneath this was a large black button labeled "Confirm." It is undisputed that plaintiff checked the box and clicked the "Confirm" button.
The January 2021 terms of use provide, initially, that "[b]y accessing or using [Uber's] Services, you confirm your agreement to be bound by these Terms. If you do not agree to these Terms, you may not access or use the Services." The fifth paragraph of the terms sets forth the following warning in bolded, all-capitalized text:
"IMPORTANT: PLEASE BE ADVISED THAT THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS BETWEEN YOU AND UBER CAN BE BROUGHT, INCLUDING THE ARBITRATION AGREEMENT (SEE SECTION 2 BELOW). PLEASE REVIEW THE ARBITRATION AGREEMENT BELOW CAREFULLY, AS IT REQUIRES YOU TO RESOLVE ALL DISPUTES WITH UBER ON AN INDIVIDUAL BASIS AND, WITH LIMITED EXCEPTIONS, THROUGH FINAL AND BINDING ARBITRATION (AS DESCRIBED IN SECTION 2 BELOW). BY ENTERING INTO THIS AGREEMENT, YOU EXPRESSLY ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND ALL OF THE TERMS OF THIS AGREEMENT AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT DECISION."
Section 2 of the January 2021 terms sets forth the "Arbitration Agreement" itself. As relevant here, the provisions of section 2 expressly encompass "any" personal injury "claim" that accrued prior to acceptance of the updated terms, without exception for claims already commenced and pending in court:
"By agreeing to the Terms, you agree that you are required to resolve any claim that you may have against Uber on an individual basis in arbitration as set forth in this Arbitration Agreement. . . .
 
"Except as expressly provided below in Section 2(b), you and Uber agree that any dispute, claim or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof, (ii) your access to or use of the Services at any time, (iii) incidents or accidents resulting in personal injury that you allege occurred in connection with your use of the Services, whether the dispute, claim or controversy occurred or accrued before or after the date you agreed to the Terms, or (iv) your relationship with Uber, will be settled by binding arbitration between you and Uber, and not in any court of law" (emphases added).
Immediately beneath a heading titled "Rules and Governing Law," section 2 also expressly provides that the arbitrator has exclusive authority to resolve most threshold disputes concerning the interpretation or enforceability of the arbitration agreement in accordance with the consumer arbitration rules of the American Arbitration Association (hereinafter the "delegation provision"). The relevant language provides:
"The parties agree that the arbitrator ('Arbitrator'), and not any federal, state, or local court or agency, shall have exclusive authority to resolve any disputes relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement, including any claim that all or part of this Arbitration Agreement is void or voidable. The arbitrator shall also be responsible for determining all threshold arbitrability issues, including issues relating to whether the Terms are applicable, unconscionable or illusory and any defense to arbitration, including waiver, delay, laches, or estoppel. If there is a dispute about whether this Arbitration Agreement can be enforced or applies to a dispute, you and Uber agree that the arbitrator will decide that issue."
On March 3, 2021, plaintiff moved for a default judgment against Uber based on its failure to respond to the summons and complaint within the time afforded by the CPLR. This time, plaintiff served the motion by mail to CT Corporation, Uber's authorized agent in New York for service of process. Uber responded by interposing an answer to the complaint on March 15, 2021, which included an affirmative defense that plaintiff had agreed to arbitrate her claims. On March 23, 2021, [*3]Uber sent a Notice of Intent to Arbitrate in accordance with CPLR 7503 (c), referencing the January 2021 terms of use. Plaintiff's counsel responded by asserting that the process by which Uber solicited plaintiff's agreement to the January 2021 terms violated rule 4.2 of the Rules of Professional Conduct (22 NYCRR 1200.0), accusing Uber's attorneys of knowingly causing the company to engage in communications with plaintiff, a represented party, about the subject of her pending litigation without prior notice to her attorney. Plaintiff's counsel threatened to seek sanctions if Uber did not withdraw its demand for arbitration. Uber did not withdraw its demand.
Plaintiff next moved to stay Uber's demand for arbitration and requested sanctions for the company's allegedly improper communications with plaintiff. Among other things, plaintiff argued that the January 2021 arbitration agreement is procedurally and substantively unconscionable, adhesive, and contrary to New York public policy, particularly insofar as it applies to claims already pending in court. Plaintiff also argued that she never validly agreed to the updated terms, and that the manner in which the terms were presented to her violated the no-contact requirements of rule 4.2. Plaintiff asked the court to strike Uber's answer and award monetary sanctions and "other penalties" for the ethical violation. Uber cross-moved to compel arbitration and to stay the litigation, arguing that the aforementioned email and pop-up screen put plaintiff on inquiry notice of the arbitration agreement, and that her challenges to the enforceability of that agreement were matters to be submitted to the arbitrator in accordance with the delegation provision.[FN1]
Supreme Court denied plaintiff's motion and granted Uber's cross motion to compel arbitration and stay the litigation (78 Misc 3d 551 [Sup Ct, Bronx County 2022]). The court agreed with Uber that the company's communications put plaintiff on inquiry notice of the arbitration agreement in the January 2021 terms, and that plaintiff assented to that agreement through conduct which a reasonable person would understand to constitute assent. The court rejected plaintiff's arguments that Uber's communications misled her about the scope of the arbitration agreement. Finally, the court held that plaintiff failed to establish a violation of rule 4.2, concluding, among other things, that plaintiff did not show that Uber had actual knowledge either of this action or that plaintiff was represented by counsel at the time its January 2021 communications were sent [FN2]. The court also characterized plaintiff's requested sanctions for the alleged rule 4.2 violation as "drastic" [*4]and "disproportionate" (id. at 602, 606). The court stated that "the most appropriate remedy for that wrong would be the voiding of the arbitration agreement[,] [b]ut [plaintiff] does not even suggest that more targeted remedy" (id. at 607).
Plaintiff appealed, and the Appellate Division unanimously affirmed (219 AD3d 1208 [1st Dept 2023]). The Court concluded that an agreement to arbitrate was formed based on the record evidence that plaintiff was notified of the January 2021 terms and clicked a checkbox and button confirming that she had reviewed and consented to those terms. The Court stated that "[p]laintiff's arguments disputing the validity of the terms and raising unconscionability must be decided by the arbitrator, because the terms contain a delegation provision that plaintiff did not specifically challenge" (id. at 1209). With respect to the alleged rule 4.2 violation, the Court concluded that "Supreme Court providently exercised its discretion in declining to sanction Uber and its employees for the sending of mass communications that were received by plaintiff directly during the pendency of the action" (id.).
The same panel granted plaintiff leave to appeal to this Court, certifying the following question: "Was the order of this Court, which affirmed the order of the Supreme Court . . . properly made?" (2023 NY Slip Op 78234[U] [1st Dept 2023]). We now answer that question in the affirmative.
II.
This Court has consistently recognized New York's "long and strong public policy favoring arbitration" (Matter of Smith Barney Shearson v Sacharow, 91 NY2d 39, 49 [1997]; see e.g. American Intl. Specialty Lines Ins. Co. v Allied Capital Corp., 35 NY3d 64, 70 [2020]; Stark v Molod Spitz DeSantis & Stark, P.C., 9 NY3d 59, 66 [2007]; Sablosky v Gordon Co., 73 NY2d 133, 138 [1989]; Mobil Oil Indonesia v Asamera Oil [Indonesia], 43 NY2d 276, 281-282 [1977]; Matter of Prinze [Jonas], 38 NY2d 570, 574 [1976]; Matter of Weinrott [Carp], 32 NY2d 190, 199 [1973]; Matter of Staklinski [Pyramid Elec. Co.], 6 NY2d 159, 164 [1959]; Gilbert v Burnstine, 255 NY 348, 353 [1931]; Matter of Fletcher, 237 NY 440, 445 [1924]; Matter of Berkovitz v Arbib & Houlberg, Inc., 230 NY 261, 269 [1921]). In appreciation of that policy, "New York courts interfere as little as possible with the freedom of consenting parties' to submit disputes to arbitration" (Sacharow, 91 NY2d at 49-50 [internal quotation marks omitted]; see also Matter of Marchant v Mead-Morrison Mfg. Co., 252 NY 284, 298-299 [1929, Cardozo, Ch. J.]). "[W]e have steadfastly discouraged courts from becoming unnecessarily entangled in arbitrations or from serving 'as a vehicle to protract litigation' " (American Intl. Specialty Lines Ins. Co., 35 NY3d at 70, quoting Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am., 37 NY2d 91, 95 [1975]).
In this case, the parties agree that the arbitration agreement in Uber's January 2021 terms of use is governed by the Federal Arbitration Act (FAA) (9 USC § 1 et seq.). First enacted in 1925, the FAA provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract" (id. § 2; see AT & T Mobility LLC v Concepcion, 563 US 333, 339 [2011]). In other words, the Act places arbitration agreements " 'upon the same footing as other contracts' " (Scherk v Alberto-Culver Co., 417 US 506, 511 [1974], quoting HR Rep 96, 68th Cong, 1st Sess at 1, 2 [1924]). "With the FAA, Congress sought to counteract an historic judicial hostility toward arbitration, which often trumped the parties' clear intentions" (Schnabel v Trilegiant Corp., 697 F3d 110, 118 [2d Cir 2012], citing Allied-Bruce Terminix, Inc. v Dobson, 513 US 265, 272 [1995]). The Act represents "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary" (Moses H. Cone Memorial Hospital v Mercury Constr. Corp., [*5]460 US 1, 24 [1983]; see Buckeye Check Cashing, Inc. v Cardegna, 546 US 440, 443 [2006] [the Act "embodies the national policy favoring arbitration"]).
Concomitantly, because arbitration agreements are simply contracts, the Supreme Court has also made clear that " '[a]rbitration is strictly a matter of consent' " (Coinbase, Inc. v Suski, 602 US 143, 148 [2024], quoting Lamps Plus, Inc. v Varela, 587 US 176, 184 [2019]). Arbitration is "a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration" (First Options of Chicago, Inc. v. Kaplan, 514 US 938, 943 [1995] [emphasis added]; see Volt Information Sciences, Inc. v Board of Trustees of Leland Stanford Junior Univ., 489 US 468, 478 [1989] [the FAA "does not require parties to arbitrate when they have not agreed to do so"]). "Consequently, the first question in any arbitration dispute must be: What have these parties agreed to?" (Coinbase, Inc., 602 US at 148). That question is governed by state contract-law principles, provided that those rules do not expressly or covertly discriminate against agreements to arbitrate (see Kindred Nursing Centers L.P. v Clark, 581 US 246, 251 [2017]; Perry v Thomas, 482 US 483, 492 n 9 [1987]). Here, the parties agree that New York contract law applies to the question of whether they agreed to arbitrate.
To form a binding contract under New York law, it is often said that "there must be a 'meeting of the minds' " (see Stonehill Capital Mgt. LLC v Bank of the W., 28 NY3d 439, 448 [2016], quoting Farago v Burke, 262 NY 229, 231 [1933]; Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp., 93 NY2d 584, 589 [1999]). But "in determining whether the parties possessed the necessary intention to contract, an objective test is generally to be applied. That means, simply, that the manifestation of a party's intention rather than the actual or real intention is ordinarily controlling" (Mencher v Weiss, 306 NY 1, 7 [1953]; see Brown Bros. Elec. Contrs. v Beam Constr. Corp., 41 NY2d 397, 399 [1977] ["In accordance with long-established principles, the existence of a binding contract is not dependent on the subjective intent of either (party)"]; Hotchkiss v National City Bank, 200 F 287, 293 [SDNY 1911, L. Hand, J.] ["A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent"], affd 201 F 664 [2d Cir 1912], affd sub nom. National City Bank of N.Y. v Hotchkiss, 231 US 50 [1913]). It is therefore most precise to say, as we repeatedly have, that a binding contract requires an objective " 'manifestation of mutual assent,' " through either words or conduct, to the essential terms comprising the agreement (Stonehill Capital Mgt. LLC, 28 NY3d at 448, quoting Matter of Express Indus. & Term. Corp., 93 NY2d at 589; accord Cobble Hill Nursing Home v Henry & Warren Corp., 74 NY2d 475, 483 [1989]; see Restatement [Second] of Contracts § 19). "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract" (Matter of Express Indus. & Term. Corp., 93 NY3d at 589; see Kolchins v Evolution Mkts., Inc., 31 NY3d 100, 106 [2018]; Zheng v City of New York, 19 NY3d 556, 577 [2012]). As with any other contract, the party seeking to enforce an arbitration agreement bears the burden to prove these elements by a preponderance of the evidence (see Fleming v Ponziani, 24 NY2d 105, 110 [1969]).
Because contract formation is governed by an objective rather than a subjective standard, there is no requirement that a party have correctly understood—or even reviewed—the terms presented by the offeror for their manifestation of acceptance to be effective. Instead, courts ask whether the offeree was put on inquiry notice of the contractual terms (see Starke v Squaretrade, Inc., 913 F3d 279, 289 [2d Cir 2019] [applying New York law]; Blossom v Dodd, 43 NY 264, 268-[*6]270 [1870]). An offeree is placed on inquiry notice of contractual terms when those terms are clearly and conspicuously presented to the offeree as a contract and made available for review (see Blossom, 43 NY at 268-269 ["The delivery and acceptance of a paper containing the contract may be binding, though not read, provided the business is of such a nature and the delivery is under such circumstances as to raise the presumption that the person receiving it knows that it is a contract, containing the terms and conditions"]). It then becomes the responsibility of the offeree, before manifesting assent, to "inquire" further by reading and assessing the proposed terms to determine whether they are acceptable. Under well-established law, a person who accepts a written contract without first undertaking this review generally bears the risk that the agreement may contain provisions they do not like or expect (see Morris v Snappy Car Rental, 84 NY2d 21, 30 [1994] [involving a standardized car rental agreement]; Pimpinello v Swift & Co., 253 NY 159, 162-163 [1930] [a contracting party, "having the will to sign the writing, is bound by the consequence, 'reasonably to have been anticipated' from the signing of a document unread, that its terms might not truly express the intent of the signer"]; Metzger v Aetna Ins. Co., 227 NY 411, 416 [1920] ["when a party to a written contract accepts it as a contract he is bound by the stipulations and conditions expressed in it whether he reads them or not"]; Miller v Phoenix Mut. Life Ins. Co., 107 NY 292, 296 [1887] [it is not "generally a defense to an action founded upon (a contract) that the party did not read the contract, or was ignorant of its contents, or that it was prepared by the party claiming the benefit of it, unless he also shows that his signature thereto was obtained by misrepresentation or fraud"]). A contrary rule "would introduce into the law a dangerous doctrine" (see Metzger, 227 NY at 415), by allowing one contracting party's negligence or post-hoc dissatisfaction to frustrate the reasonable expectations of the other party or parties, in contradiction of the objectives of contract law "to protect the parties' reasonable expectations, avoid fraud, and promote stability in commercial transactions" (see MAK Tech. Holdings Inc. v Anyvision Interactive Tech. Ltd., — NY3d &mdash, &mdash, 2024 NY Slip Op 03376, *1 [2024]).
Sometimes, of course, there are instances in which an offeree's failure to review or appreciate a particular term results not from their own "negligence or inexcusable trustfulness," but from another party's wrongful conduct [FN3] (see Metzger, 227 NY at 416). The general rule in such cases is that the elements of offer and acceptance are still satisfied, although the "resulting contract may be voidable" due to the wrongful conduct (see Restatement [Second] of Contracts, § 19 [3]; cf. Kamerman v Curtis, 285 NY 221, 225-226 [1941] [distinguishing between fraud in the inducement and fraud in the factum]).
Importantly, under both the FAA and New York law, parties may agree to have an arbitrator decide not only the merits of a dispute, but also " 'gateway questions of arbitrability,' " such as [*7]whether their agreement to arbitrate covers a particular controversy or whether one party should be relieved from the agreement due to the wrongful conduct of another party (Henry Schein, Inc. v Archer & White Sales, Inc., 586 US 63, 67-68 [2019], quoting Rent-A-Center, West, Inc. v Jackson, 561 US 63, 68-69 [2010]; Howsam v Dean Witter Reynolds, Inc., 537 US 79, 84 [2002]; accord Revis v Schwartz, 38 NY3d 939, 940 [2022]). The Supreme Court has repeatedly "explained that an 'agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the . . . court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other' " (Henry Schein, Inc., 586 US at 68 [emphasis added], quoting Rent-A-Center, West, Inc., 561 US at 70). Thus, before enforcing a provision that delegates arbitrability issues to an arbitrator, the court must first assess whether the delegation provision is itself valid (see Coinbase, Inc., 602 US at 149). In undertaking that analysis, the court must keep in mind that, as a matter of substantive federal arbitration law, a delegation provision is severable from the remainder of the arbitration provision and contract in which it appears (id. at 150-151; Rent-A-Center, West, Inc., 561 US at 71-72; Buckeye Check Cashing, Inc., 546 US at 445; Prima Paint Corp. v Flood & Conklin Mfg. Co., 388 US 395, 402-403 [1967]). Therefore, unless a party "challenge[s] the delegation provision specifically," the court must enforce it according to its terms, which in the case of a comprehensive delegation provision will mean leaving any challenge to the enforceability of the arbitration agreement or contract more generally for the arbitrator (Rent-A-Center, West, Inc., 561 US at 72).
One type of direct challenge that must be resolved by a court is a claim that the parties did not in fact agree to delegate arbitrability issues, which may arise from a broader challenge to the formation of the underlying contract (see Granite Rock Co. v International Brotherhood of Teamsters, 561 US 287, 297 [2010]; cf. Coinbase, Inc., 602 US at 150-151 ["where a challenge applies 'equally' to the whole contract and to . . . [a] delegation provision, a court must address the challenge"]). In contrast, challenges that go solely to the enforceability of other provisions of the contract and do not relate to the severable delegation provision cannot be considered by the court (see Rent-A-Center, West, Inc., 561 US at 71-72 [instructing that the FAA "operates on the specific 'written provision' to 'settle by arbitration a controversy' that the party seeks to enforce" (emphasis added)]).
Although " 'courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so' " (Coinbase, Inc., 602 US at 149 [brackets omitted], quoting Kaplan, 514 US at 944), where that standard is met, "courts must respect the parties' decision as embodied in the contract" by leaving the arbitrability issues for the arbitrator (Henry Schein, Inc., 586 US at 65). Indeed, in such a case, courts may not rule on the potential merits of an arbitrability issue even if the arguments of the party seeking to arbitrate "appear[] to the court to be frivolous" or even "wholly groundless" (see id. at 68 [internal quotation marks omitted]).
III.
There is no sound reason why the contract principles described above should not be applied to web-based contracts in the same manner as they have long been applied to traditional written contracts. Although this Court has not, until now, had the opportunity to offer substantial guidance on the question, state and federal courts across the country have routinely applied "traditional contract formation law" to web-based contracts, and have further observed that such law "does not vary meaningfully from state to state" (Edmundson v Klarna, Inc., 85 F4th 695, 702-703 [2d Cir 2023]). Case law from other jurisdictions may therefore provide useful guidance (id. at 703).
First, as with any other type of contract, formation of a web-based contract requires a "manifestation of mutual assent sufficiently definite to assure that the parties truly are in agreement with respect to all material terms" (see Stonehill, 28 NY3d at 448 [internal quotation marks omitted]). Consistent with this principle, courts have examined whether the offeree of a web-based contract was put on inquiry notice of the contractual terms (see e.g. Edmundson, 85 F4th at 703 [noting that New York, California, and Connecticut law are all similar]; Kauders v Uber Technologies, Inc., 486 Mass 557, 572-573 [2021] [Massachusetts law]; Sgouros v TransUnion Corp., 817 F3d 1029, 1034 [7th Cir 2016] [Illinois law]). The existence of such notice must be evaluated objectively, in line with our focus on the "objective manifestations of the intent of the parties as gathered by their expressed words and deeds" (Stonehill, 28 NY3d at 448-449 [internal quotation marks omitted]). Thus, as other courts have recognized, a user does not need to have actually read and understood the terms of an internet contract to be so bound; rather, where a "reasonably prudent user" would have been on inquiry notice of contractual terms, an offeree may still be bound by them (Meyer v Uber Technologies, Inc., 868 F3d 66, 74-75 [2d Cir 2017]). A reasonably prudent user is one who is neither "highly savvy" nor "a complete stranger" to computers or smartphones—that is, someone who has general familiarity with how to navigate a website, use a scroll bar, recognize a hyperlink, and download an application (see Edmundson, 85 F4th at 703-704).
To effectuate this objective standard, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in way that would put her on inquiry notice of such terms" (Starke, 913 F3d at 289). For example, "[w]here the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the [web-based] agreement" (Nguyen v Barnes & Noble Inc., 763 F3d 1171, 1177 [9th Cir 2014] [collecting authorities]). "By contrast, when terms are linked on an uncluttered interface and temporally and spatially coupled with the mechanism for manifesting assent, and the user does not need to scroll beyond what is immediately visible to find the terms, [courts] have concluded, as a matter of law, that the interface provided reasonably conspicuous notice of the existence of contractual terms" (Edmundson, 85 F4th at 704 [internal quotation marks omitted]).
In addition to inquiry notice, formation of a web-based contract under New York law also requires a clear and objective manifestation of assent (see Stonehill, 28 NY3d at 448). This manifestation need not take any one particular form. Although an internet or smartphone user need not explicitly say "I agree" to the contractual terms, they must engage in conduct that a reasonably prudent user would understand to constitute assent (Edmundson, 85 F4th at 704-705 [discussing relevant considerations]).
We now turn to the application of these principles to Uber's January 2021 terms of use. Only a few days before plaintiff purportedly agreed to the terms, she received the following email: image cached at 
https://www.nycourts.gov/reporter/webdocs/WuvUberTechInc_Email-UpdatedTermsofUse.pdf.
The headline of the email, "Updated Terms of Use," and the large text immediately beneath it clearly informed plaintiff that she would soon "be asked to review and agree to [Uber's] updated terms [of use]." Moreover, the email specifically advised plaintiff that the terms would include, among other subjects, "changes to the Arbitration Agreement." The terms were accessible through several hyperlinks, including a large black button at the very top of the email specifically labeled "Review terms," and the text "Terms of Use" in the first line of the first paragraph, which was distinguished from the black text surrounding it by the signature blue font indicating a hyperlink (see [*8]Edmundson, 85 F4th at 704, 707; Meyer, 868 F3d at 77-78). Finally, the text of the email expressly advised plaintiff how she could manifest assent to the terms, i.e., by tapping "Confirm" on a pop-up window that would automatically appear when she opened the Uber application on her smartphone. The email was written in plain language.
Only a few days later, Uber's January 2021 terms of use were presented to plaintiff by means of a clickwrap process—a means of acquiring binding assent from consumers that has been widely upheld by courts across the country [FN4] (see Toth v Everly Well, Inc., 2024 U.S. App. LEXIS 24350, at *12-13 [1st Cir Sep. 25, 2024, No. 23-1727]; Oberstein v Live Nation Entertainment, Inc., 60 F4th 505, 513 [9th Cir 2023]; Meyer, 868 F3d at 75; Hancock v AT & T Co., 701 F3d 1248, 1256 [10th Cir 2012]; Brooks v Lang Yang, 216 AD3d 505, 506 [1st Dept 2023]). As previewed in the email, plaintiff was presented with the following pop-up screen when she opened the Uber app on her smartphone: image cached at 
https://www.nycourts.gov/reporter/webdocs/WuvUberTechInc_App-PopUpScreen.pdf.
The headline and the larger text in the center of the screen—"We've updated our terms" and "We encourage you to read our updated Terms in full"—clearly advised plaintiff that she was being asked to agree to a contract with Uber. The terms themselves were again made accessible by a hyperlink on the words "Terms of Use," which were formatted in large, underlined, blue text. A reasonably prudent user would have understood from the color, underlining, and placement of that text, immediately beneath the sentence "encourag[ing]" users to "read [the] updated Terms in full," that clicking on the words "Terms of Use" would permit them to review those terms in their entirety. Finally, Uber provided plaintiff with an unambiguous means of accepting the terms by including a checkbox, "Confirm" button, and bolded text expressly stating that, "By checking the box, I have reviewed and agree to the Terms of Use." It is undisputed that plaintiff checked and box and clicked the "confirm" button.
It is unclear from the record whether plaintiff clicked on any of the several prominently-placed hyperlinks that would have enabled her to actually review and assess the January 2021 terms. Had she done so, however, plaintiff would have seen that those terms included an arbitration agreement. As already noted, that portion of the agreement was disclosed in bolded, all-capitalized text in the fifth paragraph, and the arbitration agreement itself was set forth in the very next section under the prominent heading "Arbitration Agreement."
Numerous courts have held that this very clickwrap process, or those substantially like it, satisfy the requirements for formation of an agreement to arbitrate (see e.g. Brooks, 216 AD3d at 506-507; Rigano v Uber Tech., Inc., 2024 NY Slip Op 51381[U] [Sup Ct, Westchester County 2024]; Garcia v Lora, 2024 NY Misc LEXIS 8550 [Sup Ct, Bronx County, Feb. 26, 2024, No. 807666/2023E]; Williamson v Alexander, 2022 NY Slip Op 34503[U] [Sup Ct, Kings County 2022]; Wakeman v Uber Tech., Inc., 2024 US Dist LEXIS 35578 [D Kan Feb. 28, 2024, No. 23-cv-02092-TC-TJJ]; Hamilton v Uber Tech., Inc., 2023 US Dist LEXIS 158628 [SD NY, Sep. 7, 2023, No. 22-CV-6917 (PGG) (OTW)]; see also Mejia v Linares, 219 AD3d 1251, 1252 [1st Dept 2023] [solely insofar as it discusses Uber's 2021 clickwrap process]). We agree. Uber's clickwrap process put [*9]plaintiff on inquiry notice of the January 2021 terms—including the prominently placed arbitration agreement—and she manifested her assent to those terms by both clicking on the box and pressing the "confirm" button.
Plaintiff argues that her assent to the arbitration agreement was not effective, or should not be enforced, because Uber knew, or should have known, that she would never agree to arbitrate claims already pending in court and, further, that neither the January 2021 email nor the pop-up screen drew her attention to that aspect of the agreement's alleged scope. She relies on the Restatement (Second) of Contracts, which provides that "standardized agreements" should be enforced "with respect to the terms included in the writing," except that where the offeror "has reason to believe that the party manifesting [] assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement" (Restatement [Second] of Contracts § 211 [1], [3]). Plaintiff further asserts that Uber's communications and the January 2021 terms were "actively misleading" because they implied that the arbitration agreement would only apply to future claims against the company, and the language covering accrued personal injury claims was "buried" in the agreement. As will be explained, these questions are for the arbitrator to resolve, because they neither call into question the formation of the arbitration agreement nor directly challenge the delegation provision contained in that agreement.
Contrary to plaintiff's assertions, her arguments do not raise an issue of contract formation. Uber's clickwrap process satisfied the contract-formation requirements of offer and acceptance. Although plaintiff's accusations of misrepresentations or unconscionable conduct may raise questions as to the enforceability of the provision of the arbitration agreement purporting to cover preexisting claims, the Supreme Court has made clear that those are not formation questions (see e.g. Rent-A-Center, West, Inc., 561 US at 73-75 [unconscionability]; Buckeye Check Cashing, Inc., 546 US at 444 [argument that contract was void ab initio for illegality and against public policy]; Prima Paint Corp., 388 US at 396-397 [fraud in the inducement]). Rather, at their core, these questions ask "whether [the arbitration agreement] is legally binding, as opposed to whether it was in fact agreed to" (see Rent-A-Center, West, Inc., 561 US at 69 n 1).
The very Restatement section on which plaintiff relies makes clear that its requirements do not go to the question of contract formation. As noted above, the specified consequence of a violation of section 211 is that the "particular term . . . is not part of the agreement"—not that no agreement was formed (see Restatement [Second] of Contracts § 211 [3] [emphasis added]). Put differently, the offending term is unenforceable and effectively severed from the contract formed by the parties' manifestations of assent, which is otherwise unaffected [FN5]. Formation defects, by contrast, prevent the creation of any contract at all (see Buckeye Check Cashing, Inc. v Cardegna, 546 US at 441 n 1 [describing true formation issues such as capacity, agent authority, and "whether the alleged obligor ever signed the contract"]). This distinction is critical when it comes to arbitration agreements like this one, with broad delegation provisions. If no agreement was ever formed, it would be improper for this Court to enforce any provision set forth therein, including a delegation provision. But if the problem is solely with the enforceability of a "particular term"—here, the language requiring plaintiff to arbitrate personal-injury claims that "occurred or [*10]accrued before or after the date [she] agreed to the Terms"—the severable delegation provision is not affected.
In the delegation provision, the parties expressly agreed that the arbitrator would have "exclusive authority" over any disputes relating to the applicability or enforceability of the arbitration agreement, including "all threshold arbitrability issues, . . . issues relating to whether the Terms are . . . unconscionable . . . any defense to arbitration . . . [and any] dispute about whether this Arbitration Agreement can be enforced or applies to a dispute." That language easily covers all of plaintiff's challenges relating to how Uber misled her. Therefore, unless plaintiff can establish that the delegation provision, specifically, is invalid, her enforceability challenges are for the arbitrator (see e.g., Rent-A-Center, West, Inc., 561 US at 66; Scott v CVS, 2023 U.S. App. LEXIS 11900, *4 [3d Cir May 15, 2023, No. 22-3314]). Here, plaintiff does not contend that the delegation provision itself was hidden from her, is unconscionable, or is against public policy. She makes those contentions only with respect to the separate language in the arbitration agreement requiring the parties to arbitrate personal injury claims that accrued prior to its formation. Under the Supreme Court's well-settled severability rule, the delegation provision must be enforced regardless of "the substance of the remainder of the contract" (see Rent-A-Center, West, Inc., 561 US at 71-72).
Finally, plaintiff argues that Uber should be barred from enforcing the arbitration agreement, and that severe sanctions should be awarded against the company, because Uber knowingly solicited her agreement to arbitrate pending claims without prior notice to her attorney in violation of rule 4.2 of the Rules of Professional Conduct. These arguments arguably require a different analysis, inasmuch as they could at least potentially render the delegation provision itself voidable (see Coinbase, Inc., 602 US at 150-151; Rent-A-Center, W., Inc., 561 US at 74). But even assuming that it is within our authority to consider the rule 4.2 question, we hold that Supreme Court did not abuse its discretion in declining to invalidate the delegation provision—much less the broader arbitration agreement—as a sanction for that purported ethical violation. As an initial matter, invalidation of the delegation provision or arbitration agreement was not among the sanctions requested by plaintiff for the rule 4.2 violation (see 78 Misc 3d at 601-602). In any event, there is record support for Supreme Court's affirmed factual finding that Uber lacked actual knowledge of this litigation at the time it solicited plaintiff's assent to the January 2021 terms, rendering rule 4.2 inapplicable.
* * *
For essentially as long as there have been written contracts, parties have entered them without first carefully reviewing their terms. That failure can have legal consequences, whether the party is a sophisticated entity or an ordinary consumer, and whether the contract is presented on paper or through an electronic pop-up window. Here, the consequence of plaintiff's purported failure to carefully review Uber's updated terms of use is that she must make her arguments regarding Uber's allegedly deceptive and unconscionable conduct to a neutral arbitrator, not the courts.
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

RIVERA, J. (dissenting):

Plaintiff was injured in an automobile accident while using defendant Uber Technology's [*11]ride-sharing services. She hired a lawyer and sued Uber and the drivers involved in state court. Thereafter, Uber sent millions of its customers a hyperlink to its "Updated Terms of Use," that includes a mandatory arbitration provision which Uber asserts required recipients including plaintiff to arbitrate rather than litigate any claims going forward. Uber never sent the updated terms to plaintiff's counsel of record. Plaintiff contends that she did not intend and did not agree by these updated terms to resolve her already-filed lawsuit through binding arbitration. Thus, the question on this appeal is one of contract formation: "whether any agreement between the alleged obligor and obligee was ever concluded" (Buckeye Check Cashing, Inc. v Cardegna, 546 US 440, 444 n 1 [2006]). That decision is for the courts.
The United States Supreme Court and this Court have repeatedly and consistently held that when a party contests a motion to compel arbitration based upon a contractual arbitration clause, the courts must determine whether the parties have entered a contract at all (see e.g. Granite Rock Co. v International Bhd. of Teamsters, 561 US 287, 296 [2010]; Henry Schein, Inc. v Archer & White Sales, Inc., 586 US 63, 69 [2019]; Buckeye Check Cashing, Inc., 546 US at 444, n 1). In New York, "[t]o form a binding contract, there must be a meeting of the minds such that there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (see Stonehill Capital Mgt. LLC v Bank of the W., 28 NY3d 439, 448 [2016] [internal quotations and citations omitted] [emphasis added]). The majority acknowledges that contract formation in New York requires inquiry or actual notice of all material terms, but fails to recognize that mandated removal from court to arbitration of an already filed lawsuit is a material term for these parties that is separate and distinct from a general arbitration provision for future suits. Because plaintiff was not on actual or inquiry notice of such a consequential term, no contract was formed here, at least as to relevant litigation-related terms. Under traditional contract principles and precedent, plaintiff—or any reasonable person—would not have understood the update encompassed their preexisting lawsuit. Uber's general customer update lacks an express reference to pending litigation, uses prospective language, and sets its effective date months after circulation. Moreover, Uber sent the update directly to an adverse party—plaintiff—rather than the counsel of record. Under these circumstances, there was no agreement to arbitrate and Uber therefore lacks a contractual basis for forcing plaintiff out of the courtroom. I dissent.
I.
The Federal Arbitration Act (FAA) provides that arbitration agreements are "valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract" (9 USC § 2).[FN6] "[A]rbitration agreements are simply contracts" (Coinbase Inc. v [*12]Suski, 602 US 143, 148 [2024]). They hold no greater position under the law than any other contract (Rent-A-Center West, Inc. v Jackson, 561 US 63, 69 n1, n2 [2010]). Contracts inducing arbitration are on equal footing with other contracts, in that they require "clear and unmistakable" evidence of intent (id.). Arbitration "is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration" (First Options of Chicago, Inc. v Kaplan, 514 US 938, 943 [1995]). That choice is consequential
"because a party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute (say, as here, its obligation under a contract). But, where the party has agreed to arbitrate, [they], in effect, ha[ve] relinquished much of that right's practical value. The party still can ask a court to review the arbitrator's decision, but the court will set that decision aside only in very unusual circumstance" (id. at 942).
"Arbitration is strictly a matter of consent." (Coinbase Inc., 602 US 143, 148). It is thus axiomatic that the parties must mutually agree to arbitrate before a court may order arbitration. "It is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide" (Granite Rock Co., 561 US at 296), for it is "generally [a] nonarbitral question whether an arbitration agreement was 'ever concluded' " (id. at 296, quoting Buckeye Check Cashing, Inc., 546 US at 444, n. 1). In other words, "a court may not compel arbitration until it has resolved the question of the very existence of the contract embodying the arbitration clause" (Specht v Netscape Commc'ns Corp., 306 F3d 17, 26 [2d Cir 2002] [internal citation and quotation omitted] [Sotomayor, J.]).
Of course, the question of whether the parties entered an agreement at all is one of formation and separate and distinct from the question of whether an agreement formed by the parties that encompasses arbitration of the merits of the parties' dispute is legally valid and enforceable. The former is a matter resolved by the courts and the latter types of questions of arbitrability may be sent to an arbitrator. In other words, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists" (Henry Schein, Inc., 586 US at 69). "When deciding whether the parties agreed" to delegate the issue of arbitrability to an arbitrator, courts generally "should apply ordinary state-law principles that govern the formation of contracts" (First Options, 514 US at 944).
II.
A.
The majority clutters the issue with its description of how Uber's correspondence and the updated terms include certain bolded language and where on a customer's smartphone this language and acceptance of terms the checkbox could be found (see majority op at 3-4). Even if that is useful narrative background, it is completely irrelevant because there is no record that plaintiff clicked on the hyperlink and read the updated terms. Uber's silence on this issue suggests that she did not. Given that Uber presented documentation that plaintiff had received and opened its email advising that it had updated its terms of use, it is hard to believe that Uber would not have confirmed and [*13]presented documentation that plaintiff clicked on the hyperlink.
If she did not read the terms, then plaintiff was like most people. The reality is that a majority of customers never read these terms (see Ian Ayres & Alan Schwartz, "The No-Reading Problem in Consumer Contract Law," 66 Stan L Rev 545, 547 [2014], citing Yannis Bakos et al., Does Anyone Read the Fine Print? Testing a Law and Economics Approach to Standard Form Contracts 1 (NYU Sch of Law Ctr for Law, Econ & Org, Working Paper No. 09-40, [2009], available at http://ssrn.com/abstract=1443256 [empirical study of 45 thousand households found that "one or two out of every thousand retail software shoppers chooses to access the license agreement, and those few that do spend too little time, on average, to have read more than a small portion of the license text"])[FN7]. Uber provides a ride-share platform that connects its customer to its driver. Most customers will access the app and simply check off agreement to the terms to get that ride. In any case, we need not resolve the question of whether plaintiff actually read the updated terms of use all the way through before checking the box agreeing to the terms. Even if she did, the law still favors plaintiff since the dispositive question is how a reasonable person would interpret the updated terms.
B.
Contract formation is a matter of state law and requires evidence of the parties' "clear and unmistakable" agreement to arbitrate (First Options, 514 US at 944 [internal citation and quotation omitted]). As a first principle of contract law—impressed on every novice law student—"there must be a meeting of the minds, such that there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (Stonehill Cap. Mgmt., LLC v Bank of the West, 28 NY3d 439, 448 [2016] [internal citations and quotations omitted]). The arbitration provision is a significant and material term for plaintiff, as it restricts her right to continue pursuing relief in court (see First Options, 514 US at 944). The question remains whether a reasonable person would have understood that the updated terms apply to pending lawsuits against Uber so that agreement to the updates constitutes assent to mandatory arbitration of claims in litigation.
Assent based on a meeting of the minds requires notice—express or inquiry [FN8]—of the terms of the proposed agreement (Express Indus. & Terminal Corp. v New York State Dept. of Transp., 93 NY2d 584, 589 [1999]; Starke v SquareTrade, Inc., 913 F3d 279, 288-289 [2d Cir 2019] [applying New York law]).[FN9] "Where an offeree does not have actual notice of certain contract terms, [they are] nevertheless bound by such terms if [they are] on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent" (Starke, 913 F3d at 289 [emphasis added]). "In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention" (id. [emphasis added]). Thus, notice is a precondition to assent. One cannot have notice of the terms if the terms are not obvious, and one cannot assent if there is no notice of the terms.
Even if the parties are on notice of a term in the sense that it is accessible and not obfuscated in presentation, that does not end the inquiry. The parties must still have a shared understanding of the terms for them to assent (Berkson v Gogo LLC, 97 F Supp 3d 359, 403 [ED NY 2015] ["The offeror must show that a reasonable person in the position of the consumer would have known about what he was assenting to"]; ISC Holding AG v. Nobel Biocare Invs. N.V., 351 F Appx 480, 481 [2d Cir 2009] ["Without a meeting of the minds such that an enforceable agreement to arbitrate was formed, we will not compel arbitration"]). Thus, plaintiff can only be bound to arbitrate the claims she filed in state court if she both had notice and understood the updated terms to encompass those claims. The update may have been crystal clear about future disputes or at least claims not yet filed, and clearly understood by a reasonable person to carry the parties' shared intended meaning.
The majority concludes that there is no formation problem here because, either plaintiff was on inquiry notice that there was an agreement or, the contract meets the inquiry notice standards for a typical contract of adhesion with a general mandated arbitration provision (majority op at 24-25). This is a misstatement of the inquiry notice standard required for contract formation and also fails to grapple with the actual material term at issue here: a provision that forces already-filed lawsuits [*14]from courts to arbitrators. The Supreme Court in First Options established that this inquiry notice standard is provision-specific and requires more than just the plaintiff being on inquiry notice of an agreement. The Court warned that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so" (514 US at 944 [internal citation omitted]). It has subsequently explained that this evidentiary requirement is an " 'interpretive rule' based on an assumption of the parties' expectations" (Rent-A-Center West, Inc., 561 US at 69 n 1). The rule "pertains to the parties' manifestation of intent, not the agreement's validity" (id. [emphasis added]). If evidence of manifest assent is lacking, then there is no question for the arbitrator (id.). That is exactly the case here.
The majority mischaracterizes the Restatement [Second] of Contracts § 211 (3) and argues that the "consequence of a violation of section 211 is that the 'particular term . . . is not part of the agreement'—not that no agreement was formed" to support its position that a contract exists between plaintiff and Uber (majority op at 23 [citation omitted]). The actual language of the Restatement belies this reading, and consistently treats unexpected terms of which a party does not have actual or inquiry notice as a contract formation issue. "Where the other party has reason to believe that the party manifesting such assent would not do so if [they] knew that the writing contained a particular term, the term is not part of the agreement" (Restatement [Second] of Contracts § 211 [3]). The majority takes the Restatement out of context in order to conclude that because the rule is closely related to unconscionability, the rule does not pertain to formation. The full Restatement commentary is explicit that unexpected terms are simply not part of the contract. Thus, the majority has it backwards: it is a question of formation, and it is not a question of enforcement.
"f. Terms excluded. Subsection (3) applies to standardized agreements the general principles stated in §§ 20 and 201. Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation. A debtor who delivers a check to his creditor with the amount blank does not authorize the insertion of an infinite figure. Similarly, a party who adheres to the other party's standard terms does not assent to a term if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known that the agreement contained the particular term. Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view. This rule is closely related to the policy against unconscionable terms and the rule of interpretation against the draftsman. See §§ 206 and 208" (id.).
The contract in this case does not contain a run-of-the-mill arbitration provision. As the Restatement commentary notes, with contracts of adhesion, consumers "trust to the good faith of [*15]the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated" (id., comment b). Here, plaintiff is similarly-situated to Uber customers with pending lawsuits. Thus, the question is whether those Uber customers would have assented to the arbitration provision. Without that assent, there is no formation as concerns the arbitration provision. Unsurprisingly, the majority can cite no case or authority for its sweeping proposition to the contrary. The majority's view strains credulity and disregards the most basic principles of our contract law.
III.
Plaintiff maintains that the updated terms of use cannot be understood to require that she arbitrate claims then pending in state court. While the update may be crystal clear that it applies to all disputes not yet litigated, plaintiff is correct that the update could not have put a reasonable person on notice or have led them to understand that acceptance of the revised terms would force them to arbitrate previously filed, currently pending claims.
We need only look to the method of notification and the update's content to reach this conclusion. Uber's "Updated Terms of Use," were sent via hyperlink to millions of Uber customers months after plaintiff was injured and filed her action.[FN10] The majority fails to convincingly explain how plaintiff should have been on inquiry notice that clicking "accept" on a pop-up box—a necessary prerequisite to order an Uber ride—would have the wholly unrelated effect of changing the venue of her filed, pending lawsuit. Indeed, the update was not sent to counsel and lacks any express reference to pending litigation. The update conspicuously fails to state what Uber now claims plaintiff should have easily understood, that the mandatory arbitration provision applies to lawsuits already filed. That lack of express language is fatal to Uber's argument because without it neither plaintiff—nor any reasonable layperson—could have been on actual or inquiry notice or have understood that the update would encompass her lawsuit.
In the usual course, Uber's counsel would have had to seek plaintiff's consent to remove the case from court to arbitration. Doing so would limit her options (see First Options, 514 US at 942, 946). Proceeding with arbitration rather than litigation would have entailed a significant change in strategy, decided after consultation with counsel to assess the pros and cons of moving from [*16]our public justice system to private dispute resolution. Plaintiff, like any other represented party, would have assumed that all litigation-related communication from defendants—especially one with such significant consequences—would be sent directly to her lawyer. In fact, that is exactly what the rules of professional ethics require. The New York Rules of Professional Conduct Rule 4.2 states:
"(a) In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the
representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law.
(b) Notwithstanding the prohibitions of paragraph (a), and unless otherwise prohibited by law, a lawyer may cause a client to communicate with a represented person unless the represented person is not legally competent, and may counsel the client with respect to those communications, provided the lawyer gives reasonable advance notice to the represented person's counsel that such communications will be taking place."
Apart from the conclusions to be drawn from what the update fails to say and how Uber avoided presenting this significant term to plaintiff's counsel, there is also the necessary import of the actual language adopted by Uber. The update states it is effective months after circulation and uses prospective language in describing the method for resolving disputes. For example, Uber titled this an "update" that would "go into effect on a future date" which suggests that Uber changed existing terms that would then apply at a later date (see "Update," Merriam Webster Online, https://www.merriam-webster.com/dictionary/update ["(1) an act or instance of updating; (2) current information for updating something; (3) an up-to-date version, account, or report"]). In addition, the update described the changes as concerning the "procedures and rules for filing a dispute against Uber" rather than cases already filed. The capitalized language at the beginning of the agreement states that the arbitration clause affected how "CLAIMS BETWEEN YOU AND UBER CAN BE BROUGHT." Again, the language is not set in the past tense, all suggesting to a reasonable person that the agreement applies to how parties will resolve disputes in the future. The fact that the update encompasses disputes arising from past events, but not disputes litigating past events would lead a reasonable person to understand the update applies only if the customer has not yet acted on their rights to sue. That is a logical reading and the one that explains the absence of affirmative language to include pending litigation.[FN11]
Under these circumstances, the update can only be read to apply to disputes where the [*17]customer has not yet affirmatively exercised their right to seek relief in court. Therefore, plaintiff was not on notice and could not have understood that the terms of use required that she arbitrate her pending personal injury action. Without that understanding, she could not assent to binding arbitration when she checked the box accepting the updated terms of use.
IV.
Uber claims that its updated terms of use allow but one interpretation by its users: the terms require binding arbitration of all customer disputes, including those pending in court before the update was drafted and mass disseminated. But if that is what Uber intended to make clear to its users it took pains to confuse those who, at the time, were adverse parties in litigation. For what lawyer and what sophisticated business would draft
a material term with counterintuitive language that limits their customers' rights by mandating arbitration, send that purported offer as part of a mass electronic mailing to a customer in a preexisting lawsuit, but not their counsel of record, in apparent, if not actual, violation of the rules against direct contact with a represented party? Established contract doctrine, caselaw and rules of professional conduct require direct dealings with opposing counsel, and no client suing Uber would think any different.
The majority focuses solely on what it views as a reasonable interpretation of the updated terms, and not what a reasonable layperson would understand and agree to. Under our law, people are bound to what a reasonable person presented with the same language and choice would understand as the terms of the agreement. Applying that law here, Uber should not be able to force plaintiff out of her chosen forum on the specious ground that a reasonable person in her position, having retained counsel, filed a claim, and engaged in motion practice, suddenly decided that arbitration was the better course. Indeed, Uber would have this Court believe that by simply clicking a box on the Uber app while waiting for the car service, plaintiff, without benefit of counsel's advice, forfeited her right to litigate her claims before the judiciary of the state of New York. That is nonsense.
Order affirmed, with costs, and certified question answered in the affirmative. Opinion by Judge Cannataro. Judges Garcia, Singas, Troutman and Halligan concur. Judge Rivera dissents in an opinion, in which Chief Judge Wilson concurs.
Decided November 25, 2024

Footnotes

Footnote 1: Uber also submitted evidence that (i) when plaintiff first signed up for her Uber account in 2016, she agreed to terms and conditions containing an arbitration agreement, and (ii) plaintiff hailed rides through Uber more than 50 times after agreeing to the January 2021 terms, including 19 times after Uber's demand for arbitration. Because we conclude that plaintiff assented to the delegation provision in the January 2021 terms through the clickwrap process described further below, it is unnecessary for us to address the legal consequences, if any, of this evidence.

Footnote 2: Supreme Court also concluded that plaintiff failed to establish the pop-up screen was "a type of communication that falls within the ambit of [r]ule 4.2" or that an attorney caused the screen to be sent to plaintiff (78 Misc 3d at 602). We express no opinion as to these issues.

Footnote 3: For example, active concealment can constitute fraud (see 60A NY Jur, Fraud and Deceit §§ 83, 84). However, there is generally no requirement that a party affirmatively warn counterparties of terms in a proposed agreement that might be considered unusual or unfavorable to them (see e.g. Guoba v Sportsman Props., Inc., 200 AD3d 658, 661 [2d Dept 2021]; Sanford/Kissena Owners Corp. v Daral Props., LLC, 84 AD3d 1210, 1211 [2d Dept 2011]; see also Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 179 [2011]).

Footnote 4: The methods by which web-based contracts are offered and accepted are detailed in Meyer (868 F3d at 75 [discussing "clickwrap," "browsewrap," and "sign-in-wrap" agreements]).

Footnote 5: The official commentary also explains that section 211 is "closely related to the policy against unconscionable terms," which, as previously explained, is an enforceability rather than a formation issue (Restatement [Second] of Contrasts § 211, comment f). 

Footnote 6: Section 4 of the FAA states that, "[t]he [district] court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement" (9 USC § 4 [emphasis added]). This section thus requires that courts must first determine that there is no dispute as to the existence of a contract (Applebaum v Lyft, Inc., 263 F Supp 3d 454, 466 [SD NY 2017]).

Footnote 7: More absurd examples highlight the extent of this problem. "PC Pitstop included a provision in its EULA that awarded '[a] special consideration which may include financial compensation . . . to a limited number of authorize licensee [sic] to read this section of the license agreement and contact PC Pitstop.' Four months passed before a user noticed the clause and claimed the $1000 prize" (Ian Ayres & Alan Schwartz, "The No-Reading Problem in Consumer Contract Law," 66 Stan L Rev 545, 547 [2014], quoting Larry Magid, It Pays to Read License Agreements, PC Pitstop, http://www.pcpitstop.com/spycheck/eula.asp).
"As an April Fools' Day prank in 2010, Gamestation put up spoof terms and conditions committing its United Kingdom consumers to sell their souls: 'Should we wish to exercise this option, you agree to surrender your immortal soul, and any claim you may have on it, within 5 (five) working days of receiving written notification from gamestation.co.uk or one of its duly authorised minions.' Over 7000 consumers made a purchase from the site that day, all checking a box saying they understood the conditions, and 'no one noticed a thing' " (Ayres & Schwartz, "The No-Reading Problem in Consumer Contract Law." 66 Stan. L. Rev. at 547, citing Lucy Kellaway, Pointless Conditions Should Not Apply: The Sopoforic Legalese of Online Transactions, Fin. Times [Jan. 23, 2011], http://www.ft.com/cms/s/0/7158c690-2596-11e0-8258-00144feab49a.html# axzz1zPmBwtYm). In a study of over 500 college students, all of them agreed to a fake social media site's terms of service, despite a term in paragraph 2.3.1 in which they gave the site the right to name their future first-born child (David Berreby, Click to Agree with What? No One Reads Terms of Service, Studies Confirm, Mar. 3, 2017, https://www.theguardian.com/technology/2017/mar/03/terms-of-service-online-contracts-fine-print [accessed Nov. 1, 2024]).

Footnote 8: Inquiry notice is a class of constructive notice of the terms of the proposed agreement (Witter v Taggart, 78 NY2d 234, 239 [1991]).

Footnote 9: To be clear, I am referring here to notice of the terms themselves not whether plaintiff had notice that Uber had updated its existing terms of use.

Footnote 10:
By all measures it appears the updated terms were intended to address what courts had
previously found to be ineffective notice of mandatory arbitration (see Kauders v Uber Technologies, 486 Mass. 557 [Mass 2021]; Cullinane v Uber Techs. Inc., 893 F3d 53, 64 [1st Cir 2018]; Sarchi v Uber Technologies, 268 A3d 258 [Me 2022]).

Footnote 11: Plaintiff's use of Uber's ride share services after clicking acceptance of the updated terms on the Uber app does not establish her acceptance of binding arbitration of her pending claims because it only indicates she accepted the claims as she understood them and as a reasonable person would interpret the terms. As I discuss, the proper interpretation excludes pending litigation from the update's arbitration provision.